### BROWN v. DAUGHERTY et al.

(Circuit Court, D. Missouri, S. W. D. February 10, 1903.)

#### No. 3.

1. HUSBAND AND WIFE—WIFE'S SEPARATE PROPERTY—RECEIPT OF PROCEEDS BY HUSBAND.

Under Gen. St. Kan. 1889, § 3752, which provides that any property which a woman may own at the time of her marriage shall remain her sole and separate property, and shall not be subject to the disposal of her husband, a husband who receives the proceeds of his wife's property in that state, sold after the marriage, holds the same in trust for her use and benefit; and it remains her property after it has been taken by him into another state, and becomes subject to the laws of such other state.

2. SAME.

Rev. St. Mo. 1889, § 6869, provides that all property of a married woman, together with all income, increase, and profits thereof, shall be and remain her separate property, and that her personal property shall not be deemed to have been reduced to possession by her husband by his use, occupancy, care, or protection thereof, unless with her assent in writing, giving him full authority to sell or dispose of the same. A husband, in Missouri, invested money received from a sale of his wife's property in other property and in business in her name, and subsequently, on a sale of such property and business, reinvested the proceeds in a farm, the title of which was taken in her name. *Held*, that the proceeds of such farm, when sold, although received by the husband, was the property of the wife; she never having given him any written authority to dispose of any of her property.

3. SAME—DEPOSIT OF WIFE'S MONEY BY HUSBAND—LIABILITY OF BANK.

A husband deposited money which he received from a sale of land owned by his wife, and which, under the law, was her separate property, in a bank in her name; stating to the cashier that he would sign the checks. The bank entered her name as the depositor, and issued a passbook in her name, which the husband showed to his wife. He subsequently drew checks against the deposit, to which he signed her name, and which the bank paid, until the money was all withdrawn and converted to his own use. The wife had not authorized the deposit; nor did she authorize the drawing of the checks, or know of the same until after the money was all withdrawn. *Held*, that the legal effect of the transaction of the deposit was to establish, prima facie, the relation of creditor and debtor between the wife and the bank, and that having accepted her as a depositor, and the money being in fact her property, the bank could not discharge its indebtedness by paying out the money without her authority, but was liable to her, under the facts shown, for the amount of the deposit.

**4. SAME—ESTOPPEL OF WIFE—AGENCY OF HUSBAND.**

The fact that the husband had been doing business in his wife's name, and handling her money, without objection on her part, did not create an estoppel against her in favor of the bank, where it was not shown that the bank had knowledge of it, or acted upon the faith of the husband's general agency.

**5. SAME—PROOF OF AGENCY.**

When it is sought to bind a married woman by acts of her husband on the ground of his agency, the evidence must be clear, cogent, and unequivocal.

This is an action by the plaintiff to recover from the defendants, as trustees of the Bank of Carterville, the sum of $4,000, alleged to have been deposited to the plaintiff's credit in said bank in June, 1895.

The petition alleges that in April, 1897, said bank, a Missouri corporation, by resolution of its stockholders, went into voluntary liquidation, and was thereby dissolved; that at the time of said dissolution the defendant Daugherty was president, and the other defendants were directors, of said corporation, and were the exclusive managers thereof; and that at the time of the dissolution there were sufficient assets and property of the bank to have paid off all of its indebtedness, including the $4,000 to plaintiff. It is then alleged that, under the provisions of the statute of the state (section 976, c. 12, art. 1, Rev. St. 1899) in force at the time in question, said officers of the bank became liable for said deposit, and it was their duty to have paid the same to plaintiff, which they have failed and refused to do after demand therefor. The answer, after tendering the general issue, alleges that one Joseph Brown, the then husband of the plaintiff, came to the defendant's bank to deposit the sum of $4,000, which he then had on his person; that he stated to the officers of the bank, in making the deposit in the name of his wife, that all checks signed by him should be honored by said bank on said fund, and the bank should pay all checks signed by him in the plaintiff's name and that nearly all of said money so deposited was accordingly paid out by said Bank of Carterville on checks so signed by said Joseph Brown; that when said bank dissolved there was about $700 on hand of said fund; and that, on the organization of the First National Bank of Carterville, the balance of said fund was turned over to the last-named bank, and was checked out, prior to the institution of this suit, in the manner above stated. The second paragraph of said answer states that, if said money was that of the plaintiff, her said husband at the time of the deposit was her authorized agent to handle the money for her, and to sign her name to checks, and that long prior thereto, and while the same was being checked out, said Joseph Brown did business in his wife's name, and was her general agent, authorized to handle the deposit and check out all of her funds. A jury being waived by stipulation of the parties, the cause was submitted to the court for hearing. The evidence showed that at the time of said deposit the name of the plaintiff, Louisa Brown, was entered by the cashier of the bank upon the register book as the depositor; and a passbook was handed by the cashier to said Joseph Brown, with the indorsement on the back thereof: "Bank of Carterville, Carterville, Mo. In Account with Louisa Brown." On the first inside page of this passbook the caption is as follows: "Dr. Bank of Carterville, in Account with Louisa Brown, Cr." And underneath which are the words and figures: "1895, June 1 By Dept. 4,000.00." The credit side of this passbook shows that, in sums ranging from $50 to $500 (most generally in sums of $100), from month to month, this fund was checked out between the time of the deposit and April 10, 1897, with the exception of $700. This passbook Joseph Brown took home with him and showed to his wife just after the deposit, showing the deposit of $4,000 in her name. She never saw this passbook, nor the credits therein, nor was she aware that he had checked said fund out, until after their separation, some time in 1900. Said Carterville bank was dissolved, as alleged in the pleadings, leaving sufficient assets to pay said debts. Said balance of $700 was transferred by the

¶ 5. See Husband and Wife, vol. 26, Cent. Dig. § 527.

Bank of Carterville to the First National Bank of Carterville in April, 1897, which fund the latter bank entered to the credit of the plaintiff; the latter bank being managed by the same officers who conducted the Bank of Carterville. After said Joseph Brown had so drawn this fund from said banks and squandered it, he and his wife separated, and he sued her for a divorce, but on her cross-bill the divorce was granted to her. The said passbook issued by the Bank of Carterville having been found by the plaintiff's daughter in a private drawer at the home of the daughter of said Joseph Brown, where he lived after the separation, which passbook disclosed the fact of the abstraction of said fund by Joseph Brown, the plaintiff took legal advice, and suit was instituted in the state court for the recovery of this fund, which, for some reason not disclosed by the evidence, was discontinued, and this action was brought in this court. Other essential facts will sufficiently appear in the following opinion.

C. W. Hamlin, John D. Porter, and W. D. Tatlow, for plaintiff.
Spencer & Spencer and Howard Gray, for defendants.

PHILIPS, District Judge. That the $4,000 deposited by Joseph Brown in the Bank of Carterville was the money of the plaintiff, the court is well satisfied. The plaintiff was a widow at the time of her marriage with Joseph Brown. She inherited from her first husband a small farm and some personal property situate in the state of Kansas, where she then resided. Joseph Brown at the time of his marriage to the plaintiff was practically impecunious. His only estate, according to his testimony, consisted in a claim to some land which he had entered in Kansas, which he sold shortly after his marriage, in about 1878, for about $1,400. About that time he and the plaintiff moved into the state of Missouri, where he squandered and consumed the proceeds of said sale of his Kansas claim, which satisfactorily appears from the evidence to have been prior to the sale of the plaintiff's land in Kansas, which occurred in about 1883, at which time they were living in the state of Missouri. The amount realized on the sale of the plaintiff's said land was about $1,400. The evidence does not show whether or not this money was turned over to Jos. Brown in the state of Kansas. It was, however, brought into the state of Missouri.

By the statute of Kansas (section 3752, Gen. St. 1889) in force at the time in question, of which statute the federal court takes judicial cognizance—

"The property, real and personal, which any woman in this state may own at the time of her marriage, and the rents, issues, profit or proceeds thereof, and any real, personal or mixed property which shall come to her by descent, devise or bequest, or the gift of any person except her husband, shall remain her sole and separate property, notwithstanding her marriage, and shall not be subject to the disposal of her husband, or liable for his debts."

Even if the proceeds of the sale of the plaintiff's said property in Kansas was received by the husband, he received it in trust for her use and benefit. When it was brought into the state of Missouri, the domicile of the husband and wife, it became subject to the laws of the latter state.

By section 6869, Rev. St. Mo. 1889, in force at the periods in question in this suit, it was provided that:

"All real estate and personal property, including rights in action, belonging to any woman at her marriage, or which may come to her during coverture, by gift, bequest or inheritance, or by purchase with her separate money or

means, or be due as the wages of her separate labor, or has grown out of any violation of her personal rights, shall, together with all income, increase and profits thereof, be and remain her separate property and under her sole control, and shall not be liable to be taken by any process of law for the debts of her husband. This section shall not affect the title of any husband to any personal property reduced to his possession with the express assent of his wife: provided, that said personal property shall not be deemed to have been reduced to possession by the husband by his use, occupancy, care or protection thereof, but the same shall remain her separate property, unless by the terms of said assent, in writing, full authority shall have been given by the wife to the husband to sell, encumber or otherwise dispose of the same for his own use and benefit."

There is no pretense that any assent in writing was ever given by the plaintiff to evidence his right of possession to this money. The statute positively interdicts any claim of right by or through him to this property, growing out of his possession, control, or management thereof, exclusive of the wife's absolute title, unless expressed in writing. His taking and using this money of the plaintiff is readily understood from the relative character and disposition of this man and wife, as the court observed them on the witness stand, and from the surrounding facts and circumstances. She is an illiterate woman, of little mentality and self-assertion, and easily imposed upon by such a man as Joseph Brown. He is a coarse man, of low instincts and little moral sense, who evidently regarded his wife as little more than a servant, with no rights he was bound to respect; holding her mind and property in complete subordination to his will and desires. Nolens volens, he took her money and invested it in mining property and in other adventures, and even in the saloon business. He employed her name in these transactions without her consent or request. She testified (and the court credits her statement) that if, at any time, she made inquiry or sought information respecting the state of the business affairs, he would curse and repulse her, and therefore she shrunk from seeking such information. He testified that he made money out of these operations, and with the proceeds a farm was bought in Newton county, Mo., in 1885, which he claimed cost about $5,000, the deed for which was made to the plaintiff in fee simple. Where the wife's separate money is invested in other property or in business, and the same is managed by the husband in her name, the proceeds thereof remain the property of the wife. He does not thereby acquire either an exclusive or community interest therein under the married woman's act of this state. This is necessarily so under the statute which expressly secures to the wife "all income, increase and profits" from her separate estate. This is the rule in Kansas. Parker v. Bates, 29 Kan. 597. Aside, however, from this aspect of the case, when the husband caused the title to this land to be placed absolutely in the wife by deed of conveyance the land became the separate estate of the wife, and repudiates the idea of a resulting trust in the husband's favor. Gilliland v. Gilliland, 96 Mo. 522, 10 S. W. 139; Schmalhorst v. Peebles, 71 Mo. App. 219, 223. When this land was sold, in 1895, the proceeds thereof, by express provision of the statute, became and remained the separate property of the wife. This land sold for something over $6,000. It was then subject to a mortgage of about $1,200, which left the net proceeds of the sale about $5,000. Four thousand

dollars of this sum is the fund deposited in the Bank of Carterville, leaving about $1,000 in the hands of Joseph Brown, which he appropriated to himself. Without more, had he deposited this $4,000 in the bank in his own name, the wife, as a feme sole, under the statute, could have maintained an action therefor against the bank, as for money had and received to her use and benefit, prior to its disbursement by the bank on the husband's order. Logically and legally it must follow that, if the bank had notice that it was the wife's money when deposited, it would be legally bound to repay the same to her, unless withdrawn by her, or by some one duly authorized by her. In Rodgers v. The Bank of Pike County, 69 Mo. 560 (a case much in point), it was held that, where the wife sells her real estate for money, the transaction amounts to a purchase of the money with her separate means, within the meaning of the married woman's act, and, if such money comes into the possession of the husband, he cannot dispose of it without her consent in writing. In that case the plaintiff's husband collected the money arising from a sale of her land, and at first deposited the amount in the bank as his own. On the same day he returned to the bank, and asked the cashier if his creditors could reach the money; and, upon being informed that they could, he directed the cashier to transfer the deposit to his wife's credit, which was done, and a certificate was made out in her name. At the same time he directed the cashier to pay out the money on checks drawn either by himself or his wife. Characteristically, however, the husband drew out the money on checks drawn in the wife's name, signed by him just as in the case at bar; and, precisely as in the case at bar, the plaintiff did not tell the husband to deposit the money in bank, but he informed her a few days afterwards that he had done so in her name. She learned afterwards, when at the bank, that her husband had already drawn out $100 of the $400 deposited, and she made no answer thereto. The wife recovered judgment for the balance of the account; and, while the case was reversed because of the nonjoinder of the husband with the plaintiff, as the law then required, it is quite clear from the opinion of Judge Napton that the wife was entitled to recover, in the absence of the requisite evidence of agency to the husband to draw the money out for her. The only doubt expressed by him was whether or not the plaintiff's silence and nonaction after she had been advised by the bank that her husband was drawing the money out on checks signed in her name was a ratification or estoppel. The same ruling was followed by the Court of Appeals in Stone v. Bank, 81 Mo. App. 9.

Conceding to the defendant the most favorable construction of what transpired when Joseph Brown deposited this money, the legal effect of it is that the cashier of the bank was advised that the $4,000 was the money of the plaintiff. The effective substance of the evidence touching this issue is that the defendant Daugherty, president of the defendant bank, introduced Joseph Brown to the cashier, W. B. Kane, as his (Daugherty's) friend, stating that he wanted to make a deposit. Thereupon Brown produced $4,000 in currency, and handed it to the cashier, saying he wanted to deposit it in his wife's name, and that he would draw it out in her name. The cashier's version of the transac-

tion is that Brown said: "I wish to make this deposit in my wife's name—Mrs. Brown. I will sign the checks." Thereupon the name of the plaintiff, Louisa Brown, was entered in the register book of depositors, and the cashier handed to Joseph Brown the passbook described in the foregoing statement of the case. The cashier never saw the plaintiff, and she was never in the bank, nor even in the town of Carterville. In his testimony the cashier, Mr. Kane, spoke of hearing a conversation of Joseph Brown at a window of the bank counter, with some clerk, perhaps, of the bank, to the effect that his reason for having made the deposit in his wife's name was that he owed some old debt in Kansas when he left there, and he was afraid his creditors might be after the money. But it is clear from his cross-examination, and a previous deposition given by him respecting this controversy, that the conversation at said window was after the money had been checked out by Joseph Brown. At the time of the deposit, Brown did not even state that the money was his, or that he deposited it as agent for his wife, or that he had any agency from her to withdraw it. The legal effect of the transaction of the deposit is that prima facie it established the relation of creditor and debtor between the plaintiff and the bank. The corollary of this proposition is that the bank could only discharge that relation by payment to the plaintiff in person or on her order, or to her authorized agent. Authorities supra. The very fact that the husband made the deposit in the name of his wife was notice to the bank that the money, prima facie, was the property of the wife. It was in the nature of a caveat to the bank that no one could thereafter withdraw this deposit without authority from her. The books of the bank and the passbook given in the name of the plaintiff constitute an admission and recognition by the bank that she was the depositor in fact and in law. The moment Joseph Brown stated that he was to withdraw this money on checks signed by him, the most ordinary business prudence would have dictated to the cashier the inquiry, "Where is your authority to do so?" A more unbusinesslike course, on the part of a bank, to accept checks on a fund known not to have been signed by the depositor, and not even by Joseph Brown as her agent, is hard to conceive.

The case of Bates v. First National Bank, 89 N. Y. 286, presents a parallel case in its principles, and the reasoning of the court is so complete and satisfactory as to justify extended quotations therefrom. In that case the wife received from her father's estate checks payable to her for $1,000, in separate sums of $500. She indorsed one of the checks in blank, and delivered it to her husband, with directions to deposit it in the defendant bank in her name, and bring her the passbook. The passbook was accordingly made out by the bank, just as in the case at bar, showing the wife to be creditor, and the bank her debtor, in the sum of $500. The husband took the passbook and delivered it to his wife. In the case at bar, Brown took the passbook home and showed it to his wife. The second check was deposited in the same way, and likewise entered in the passbook. On the trial, defendant offered to prove by its teller that, when the plaintiff's husband came to the bank and made the deposit, it was in pursuance of an agreement between him and the teller for the bank that the money

should be deposited to the credit of the wife, with the condition that it should be withdrawn upon checks made by him in her name, and the money was afterwards so withdrawn. The trial court ruled that this evidence was competent, provided it was followed up by evidence of the agency of the husband to so sign checks in his wife's name, or of the wife's permission to her husband to withdraw the money in his own name or in her name, or if counsel expected to follow it up with evidence of ratification by the plaintiff. Counsel stating that he offered the evidence irrespective of the fact of such agency or ratification, but upon the sole ground of the alleged understanding and agreement between the husband and the teller, the court ruled this evidence out. The Court of Appeals held that the evidence offered was only admissible upon the assumption that the husband was either the real owner of the fund, or was entitled to be dealt with as such by the bank; that in such case it was perfectly competent for him to dictate the terms of the deposit, and the manner of its withdrawal. "But if the husband came as agent, and not as owner, or the attending circumstances were such as to charge the bank with knowledge of his real relation to the fund, an arrangement hostile to the safety of the principal, and beyond the apparent scope of the agency, drew after it the peril attaching to a want of actual authority." The court held that the indorsement of the checks in blank, and the delivery thereof to the husband, were sufficient to make him the apparent owner, but when he made the deposit in the name of his wife, and took the passbook in her name, it disclosed the fact of his agency only to the extent of making the deposit for her. The situation then was that the bank was bound to recognize the wife as the owner, and pay only upon her order, and that when the defendant sought to show that the transaction imposed upon the bank the condition that the husband should be at liberty to withdraw it upon checks signed by him in his wife's name—

"It was inconsistent, because the bank was asked at the same moment to treat the wife as owner and depositor, and as neither, and so give to her an apparent credit which was in truth a delusion. It was suggestive of fraud, because, while assuring her of the safe disposal of her money, and the honest fulfillment of the agency she had created, it enabled her credit to be stolen away without her knowledge, and disclosed plain traces of duplicity and equivocal purpose. It was out of the usual and ordinary course of business. If the money had been the husband's, and he had merely wished to enable his wife to draw on it at will, he would naturally have deposited it to his own credit, and given her his checks, or authorized the bank to accept hers. If, on the other hand, as the bank was fairly warned, the money was hers, and she desired her husband to draw upon it freely, she would have given him her checks, or sent an order to accept his. When the bank was tendered a deposit upon conditions such as we have described, and with such knowledge as the circumstances tended to impart, its duty was to refuse the deposit, or require the assent of the wife. Omitting to do so, it took the risk of the actual truth, and paid the unauthorized checks at its peril. Any other rule would permit a bank to be blind when it ought to see, and furnish dangerous facilities for fraud. In the present case just that happened which might easily have been foreseen. The husband drew his wife's money upon fraudulent vouchers, with such aid from the bank as made it liable for the consequences. The husband's possession of the money did not authorize it to infer authority to sign the wife's name to future checks. It relied upon the husband's honesty without inquiry as to the fact, and must take the risks of its reliance. Its passbook was something more than a mere receipt. It imported, besides, a promise to pay on demand, and so had in it elements of

contract. The bank made the wife its depositor, whom it was bound to protect against vouchers not known to·be actually hers. It established a relation which it was required to respect so long as it existed, and from the duties of which it could not escape without her real authority. It trusted the husband beyond the scope of his apparent authority, and must bear the consequent loss."

To the same effect are the cases of Kerr v. Bank, 158 Pa. 305, 27 Atl. 963; Honig v. Bank, 73 Cal. 464, 15 Pac. 58. The latest utterance by the appellate courts of this state touching this question is in Armstrong v. Johnson, 93 Mo. App. 492. It is on this principle that it was held in Ball v. Liney, 44 Barb. 505, that a depositary who has received goods, to be stored from one acting agent for another, must deliver to the principal, notwithstanding the agent's directions to the contrary.

The only defense interposed to save the bank for paying out this money as it did is set up in the second paragraph of the answer, which simply alleges that Joseph Brown was the authorized agent of the plaintiff to handle the money for her, to sign her name to checks, and that a long time prior thereto, and while the money was being checked out, Joseph Brown did business in his wife's name, and was her general agent to handle all her funds, to deposit the same in banks, and check the same out. It does not plead any acts of estoppel or ratification in terms. It is the settled rule of practice under the Code in this state that no evidence is admissible to show a ratification or estoppel in pais unless the same be specifically pleaded. Wade v. Hardy, 75 Mo. 399; Bray v. Marshall, 75 Mo. 327; Noble v. Blount, 77 Mo. 235; Hammerslough v. Cheatham, 84 Mo. 21. While the answer alleges that Joseph Brown had been doing business in his wife's name, and was her general agent, fully authorized to handle all of her funds, it does not allege that this fact was known to the defendant at the time the deposit was made, or when the funds were being checked out, or that it acted upon the faith of any such general agency, so that the bank "neither acted on nor altered its conduct on account of any act of the plaintiff." Spurlock v. Sproule, 72 Mo. 503; Noble v. Blount, 77 Mo. 235. And even if a ratification or estoppel had been properly pleaded, there is no sufficient evidence to support it. The court finds the evidence to be that the plaintiff neither expressly nor impliedly authorized Joseph Brown to withdraw this money from the bank, nor was she made aware of the fact that he was checking the money out in her name prior to the dissolution of the bank.

Responsive to the spirit of the statute for the protection of the rights of married women, the court holds that, when it is sought to bind her by acts of the husband on the ground of his agency, the evidence must be clear, cogent, and unequivocal. The observation of Judge Cole in McLaren v. Hall, 26 Iowa, 305, has been approved by the Supreme Court of this state in Rodgers v. The Bank of Pike County, supra—that in view of the Legislature requiring the written assent of the wife to the reduction of the wife's property to his possession, while the statute has not prohibited her from making him her agent, nor altered the common law in that respect, the spirit of the legislative enactment requiring such unequivocal proofs "is for the

reason that in general experience of the past, if not in the philosophy of the present, the wife is under the control of and subordinate to the husband; and neither good law nor sound reason will require the wife to destroy the peace of her family and endanger the marriage relation by open repudiation, or hostile conduct towards her husband, in order to save her property from liability for his unauthorized contracts." This ruling has been reaffirmed by the Supreme Court of this state in Long v. Martin, 152 Mo. 680, 681, 54 S. W. 473. The defendant's testimony tended to show that about 1882 or 1883 Brown engaged in the mining business, in partnership with another party, in the name of his wife, and that he ran a saloon in her name; but the plaintiff's testimony is that he did not even inform her of the fact that he was taking out a saloon license in her name, or that he was using her name in the mining business, and consequently she never authorized him to transact such business. And the evidence utterly fails to show that prior to the transaction in question he ever deposited a dollar in bank in her name, and checked it out, either by signing the checks in her name, or in her name by him as agent. And there is no evidence that the bank, when it accepted the deposit in question, and when it honored the checks in the plaintiff's name drawn by Joseph Brown, had any knowledge that he had ever acted as agent for her in a single transaction. While Joseph Brown testified that his wife knew that he was using the money deposited in bank, her testimony is that she never authorized him to check the money out, and that she did not know that he had checked a dollar of it out until the disclosure of the fact on the finding of the passbook by her daughter after the separation between plaintiff and Brown. Her mere silence, or failure to go to the bank to see if the money was there, creates no estoppel. McClain v. Abshire, 72 Mo. App. 396, 397; De Berry v. Wheeler, 128 Mo. 90, 91, 30 S. W. 338, 49 Am. St. Rep. 538.

Neither can I find the quality of a ratification or an estoppel in the incident disclosed by the evidence respecting the wager made by Joseph Brown in October, 1896, on Bryan's election. It appears that he put up with a stakeholder a check drawn by him in his wife's name on the Bank of Carterville for $500. When he learned the result of the election, he repudiated the wager. He telegraphed to the bank, in the name of the plaintiff, not to pay the check; but it seems that the stakeholder had turned over the check to the winner, who had drawn the money thereon from the bank. Thereupon he instituted suit in the state court to recover from the stakeholder or the winner the amount so collected. This suit he instituted in the name of his wife, of all which the wife had no knowledge or information until he came home from Neosho, and told her that he was in some trouble about having bet $500 of her money on the election, and wanted her to go into town the next day to help him out. She went in with him; his purpose being, presumably, to prove by her that it was her money. The case was not tried, the defendants paying the money over to Joseph Brown without further contest. Four hundred dollars of this money he redeposited in the bank, and kept $100 thereof, as the court infers from the circumstances disclosed.

He did not inform his wife that it was the money in the bank he had bet, or that he put up a check therefor, and there is nothing to justify the finding that she knew or had reason to believe that he had drawn a check therefor on the fund in bank. He had retained $1,000 of the purchase money on her farm, and the plaintiff had no reasonable grounds to conclude that he had drawn upon the fund deposited in the bank. The only fact in evidence, advanced by defendants to support a claim of knowledge on her part that her husband was using the money in the bank, is the fact that he sent $500 to the plaintiff's daughter, at Springfield, Mo., to buy her a piano, and perhaps to defray expenses at school. His testimony was that he drew this money out of the bank on a check signed by him in the plaintiff's name. The passbook shows cash drawn November 6, 1895, $500; and it may be conceded that it represents the sum so advanced to the daughter. Plaintiff's statement is that she was aware of the fact that he had so advanced that amount of money, but she did not know that he had drawn it by check on the fund in bank, and that she supposed he was paying the money out of the proceeds of the horses and cattle on the farm, of which there was a large number, which he was selling at will. He never informed her of the fact that this money was drawn from the bank. It would be a strained inference from these facts for the court to find that the plaintiff had knowledge of and recognized his action in checking out the money in her name. Such evidence is not clear, cogent, and persuasive, within the rule. Nor is such fact pleaded in the answer as a ratification or an estoppel. Nor is there any evidence that the officers of the bank had any knowledge of the purpose for which said money was to be appropriated by Brown.

When on the witness stand, Joseph Brown was sharply interrogated by the court as to what disposition he had made of so large a sum as $4,000 within a period of about two years. He was unable to give any intelligent or reasonable explanation thereof. He claimed, in a general way, that he had used much of it in supporting his family. On the contrary, the plaintiff's testimony showed that during this time they were living on a farm, which was supplied with cattle and horses, and the products of the farm, out of which the family was supported and maintained; that she and her children worked hard; that she milked the cows, did the household work, sold products from the farm, and was very economical. The evidence showed that he was a man who did little work; that he raced horses and was dissipated to some extent. And I am persuaded that he wasted such a large amount of money in profligacy, on his own appetite and sporting indulgences, while his wife was living on the little farm, "to pinch and spare" to eke out a stinted livelihood. When they separated she went out into the world homeless and almost penniless, and this condition was aggravated by her ill health. Until she was freed by a divorce from her husband's domination, she should not be held guilty of laches in not looking after her claim against the bank. At the time of the separation, Joseph Brown had withdrawn the whole of the deposit.

The true explanation of the bank's conduct in this transaction is found in placing confidence personally in Joseph Brown on the introduction of him by the president of the bank to the cashier. The cashier and the disbursing clerk assumed that Brown had the authority to sign his wife's name to checks, upon an assumption of authority based alone on his statement. In law and equity, the bank should look for restitution to Joseph Brown, who deceived it.

Another fact may be adverted to by the court: On the dissolution of the Bank of Carterville and the organization of the First National Bank of Carterville, the remaining fund in the former bank, of $700, was by the defendants, of their own motion, transferred to the latter bank, and thereupon the national bank advised the plaintiff of the credit in her name of $700. She was under no legal or moral obligation to demand that fund from the First National Bank. There was no contractual relation between her and the new bank. Her contract was with the Bank of Carterville, and the relation of creditor and debtor existed alone between them. She had a right to rely upon her depositary to account for the fund when called for. A demand by her on the First National Bank the defendants would have at once claimed was a recognition of the right of the Bank of Carterville to make such transfer. While it appears from the evidence that some time prior to the institution of this action in this court the plaintiff had brought such suit against the defendants in the state court, yet, as the date thereof is not definitely fixed by the evidence, the court will award interest to the plaintiff only from the date of the filing of the present suit.

Judgment for plaintiff.