Argued at Pendleton May 4, modified July 20, rehearing denied
September 14, 1926.

## G. E. CARNES ET AL. *v.* R. E. MANNING ET AL.

(248 Pac. 137.)

Chattel Mortgages—Bill of Sale for Sheep to Secure Future Advances Held in Effect, Chattel Mortgage, Good as Between Parties, Though Very Indefinite as to Description.

1. Bill of sale for sheep, intended to secure advancements to be reimbursed from sale of sheep, *held*, in effect, chattel mortgage, except as to acknowledgment, good as between parties, although not entitled to record, and being very indefinite as to description of sheep.

---

1. Bill of sale as mortgage, see note in 6 L. R. A. 643. See, also, 5 R. C. L. 388.

**Chattel Mortgages—Recorded Chattel Mortgage on Sheep in Possession of Mortgagor Held Good as Against Prior Secret Lien Evidenced by Bill of Sale to Secure Advancements, Notwithstanding Faulty Description of Mortgage.**

2. Recorded chattel mortgage on sheep in possession of mortgagor, and sufficiently locating sheep, though faulty in description of sheep, *held* good as against prior secret lien under bill of sale to secure advances by owner of land on which sheep were maintained, and who was also owner of balance of herd with which sheep in question were run.

**Pleading.**

3. Answer, in foreclosure, denying knowledge sufficient to form belief as to fact of recordation, of chattel mortgage, which, with place of recordation, was alleged in complaint, is no denial, and allegation will be taken as admitted.

**Marshaling Assets and Securities.**

4. Where owner of sheep executed bill of sale to secure advancements, which was not recorded, and subsequently executed chattel mortgage to innocent purchaser on sheep and other goods, chattel mortgagee *held* required to reduce claim against sheep by first applying proceeds of other property to debt.

---

Chattel Mortgages, 11 **C. J.**, p. 409, n. 81, p. 458, n. 36, p. 652, n. 94.

Marshaling Assets and Securities, 38 **C. J.**, p. 1367, n. 45, p. 1382, n. 87.

Pleading, 31 **Cyc.**, p. 678, n. 54.

From *Umatilla: FRED W. WILSON, Judge.

In Banc.

MODIFIED.        REHEARING DENIED.

For appellant there was a brief over the name of *Messrs. Lowell, Clark & McIntyre,* with oral arguments by *Mr. Stephen A. Lowell* and *Mr. Edward J. Clark.*

For respondents there was a brief over the name of *Messrs. Raley, Raley & Steiwer,* with an oral argument by *Mr. J. H. Raley.*

---

3. See 21 **R. C. L.** 458.
4. See 18 **R. C. L.** 454.

McBRIDE, C. J.—This is an appeal, by the defendant Cole, from a decree of the Circuit Court in favor of the plaintiffs upon the foreclosure of a mortgage held by plaintiffs upon certain sheep described in the complaint. The facts will be stated in the opinion. In the first place, we will give a statement of the facts, not in accordance with the contentions of the parties, but as we find them to be, reserving the discussion of the evidence in the contention later in the opinion.

Cole had followed the sheep business for some thirty years and is the owner of a sheep ranch of some 2,000 acres near Pilot Rock in Umatilla County, and other large holdings of real estate. His eyesight was so defective that he carried on his business, to a great extent, through others, relying upon one A. C. Funk to keep his books and write his checks, and upon his tenants or employees to handle his sheep. In the spring of 1924, having his ranch or range without sheep upon it, and which is referred to in the testimony as the Aaron Cole ranch, he learned that the defendant Manning had a small band of sheep, which he had acquired from one Alfred Smith, but that Manning was without capital to start business on a heavy scale. They entered into an agreement for running these sheep by Manning, with a larger band bought from one Miller, upon shares during the summer of 1924. In the fall of that year they had a settlement, by Cole shipping the wether end of the Miller lambs and inferior or cross-grade of the ewe lambs, and turning over to Manning the fine wool ewe lambs to the number of about 91. On November 1, 1924, Cole and Manning entered into a written lease and contract for the leasing of the Cole ranch to Manning with the sheep consisting of 314 young ewes at $11.25, 468 older ewes valued at $7.25, and 84 lambs

valued at $6.50 per head, making a total of 866 sheep belonging to Cole. Included in the lease of the sheep was an option to Manning to buy them at any time within a year at the values named, making a total of $7,459.50. The Alfred Smith ewes owned by Manning, in his own right, had been purchased by him in 1923 and numbered about 140 head, which were old when purchased. Of these, he had raised something over 100 lambs in 1924, and after disposing of the wether end, there were 56 or 58 to add to the 91 Miller lambs turned over to him by Cole in the fall of 1924. These, numbering about 150 lambs, make up the lambs in dispute in this case. That left Cole still 84 ewe lambs of the Miller lambs, all practically of the same grade as Manning's lambs, and these were the ones mentioned in the above contract.

Shortly thereafter, Manning, in order to secure funds, mortgaged the wool crop upon the leased sheep, as he was permitted to do by the contract, to the Inland Empire Bank of Pendleton, Oregon, including the alleged 150 ewes belonging to him, for an advance of $2,000. After exhausting these funds in January, 1925, he applied to Cole for further funds getting an advance of $200, and a further advance of $156, and giving one note for the combined amount. On March 11, 1925, being again out of funds, he came to Cole and stated that the only way he saw of financing himself was by selling the alleged 150 sheep. Cole testified that he said to Manning that if he had to sell them, he would buy them and keep the herd intact. Thereupon, Cole testified that he bought the sheep with the understanding that Manning was to have the benefit of the advancing price in the spring, and they went to Funk's office, who prepared a formal bill of sale of 150 sheep from Manning to Cole, Manning

swearing that the sheep were clear of all encumbrances except for the mortgage to the bank. The $356 already advanced, and $200 paid that day and evidenced by a memorandum note, were to apply upon the purchase price when later determined.

Thereafter, on March 23d, a further advance of $150 was made to Manning, he taking a memorandum note. No notes were taken thereafter for the remaining advances in the various amounts, as shown by the exhibits on file, the total amount being about $1,200. Cole testified that in May they agreed upon $8 a head as the market value of the sheep. Cole testified that shortly thereafter he secured a statement of account from Funk and showed it to Manning, who agreed thereto and that the sheep were fully paid for. At Cole's direction, the bill of sale was placed by Funk with Cole's other papers, Manning continuing in charge of the whole herd 'with no visible change of possession until about July 1st, when they were sold to the Falconer-Hoke Trading Company, the sheep being herded, branded and sold together with the main band leased to Manning with no element of distinguishing treatment.

The bill of sale to the Falconer-Hoke Trading Company was signed by Manning with an additional written statement added thereto, signed by Cole, to the effect that he consented and agreed to the sale. The bill of sale from Manning to Cole, although awkwardly drawn, purported to convey 150 yearling ewe lambs without stating where they were situated or any distinguishing mark they had, but contained the statement that Manning was the lawful owner, that they were free from all encumbrances, and the general warranty of title. It was duly witnessed and contained an affidavit by Manning to the effect that

he was the sole owner of the property; that the same was free and clear of liens and encumbrances of every kind and nature at the date of the execution of the said bill of sale, and that it had been paid in full except the mortgage to the Inland Empire Bank.

Thereafter, Manning executed a mortgage to the plaintiffs upon the same sheep to secure the payment of $1,254.45, together with such future advances, not to exceed $400, which mortgage was duly recorded on the twenty-fifth day of July. The property so mortgaged is described as follows:

"150 yearling ewes, being the entire band and all of the yearling ewes now owned by the mortgagor and each and all of said yearling ewes being branded M on the back and being ear marked with a split in the left ear. 23 registered bucks two and three years old each branded M on the back, being all of the bucks now owned by the mortgagor, all of said sheep being now within Umatilla County and State of Oregon and at the present time located on the Aaron Cole range. Also 7 head of mares; 1 horse colt and 1 mule colt, being all of the horses now owned by the mortgagor the said mares being of different ages and possibly of different brands but all of said animals being at the home ranch of the mortgagor in Umatilla County and state of Oregon; and also 2 cows, one of them branded with 1/2 and the other being with [a half circle and two dashes underneath] being all of the cows owned by the said mortgagor and said cows being now located on the home ranch of the mortgagor near Pilot Rock, Oregon."

The herd of 150 yearling ewes were branded "M" on the back as were all the sheep belonging to both parties in the herd on the Aaron Cole ranch. They were not marked with "a split in the left ear," but were marked, as were the supposed 84 yearlings belonging to Cole, with "a crop off of both ears."

When the sale was made to the Falconer-Hoke Trading Company, and when the sheep were loaded, the plaintiffs Carnes and Royer notified the agent of the Falconer-Hoke Trading Company that they had a chattel mortgage upon the 150 lambs in the flock and showed the chattel mortgage to him. The agent of the Falconer-Hoke Trading Company then went to Cole and told him of this claim of plaintiffs, whereupon Cole told him that all the sheep were his; that he had a bill of sale of these lambs in dispute and that he would stand back of any claim made by the plaintiffs. The sale proceeded and the sheep were taken away, whereupon, plaintiffs brought this suit to foreclose their mortgage against Manning, the Falconer-Hoke Trading Company and Cole, alleging their title in the chattel mortgage to which the Falconer-Hoke Trading Company answered setting up practically the same condition of matters as between themselves and Cole and the plaintiffs. Cole answered setting up title in himself as a purchaser in good faith, claiming possession of the property and denying, for want of information sufficient to form a belief, as to whether plaintiffs had a mortgage, or whether it was recorded, and alleging, if they did have a mortgage on the property, that it was purchased with the knowledge and notice of Cole's rights in the premises. Upon the trial, the findings and decree were in favor of plaintiffs and against the defendants, who appeal to this court.

This case presents many difficulties and the decision of it either way must work a hardship upon persons innocently dealing with an admitted swindler. Manning admits that in the month of March, 1925, he executed, in favor of defendant Cole, a bill of sale of the identical lambs, which he, on the tenth

day of June, mortgaged to plaintiffs and that at said date, and subsequently, he secured from plaintiffs large advances and at least $288 in money paid upon his debt at the bank, and merchandise to the amount of $71, in addition to what he owed Carnes and Royer upon the faith of a chattel mortgage given to them on June 10, 1925. At the time he gave the chattel mortgage, he made no mention to plaintiffs of the previous conveyance to Cole and gave no excuse for his failure to do so. Under the circumstances, as shown here, he belongs in about the same category with one who steals his neighbor's sheep off the range, and his testimony is of little value where contradicted by any reputable witness. The testimony of Cole, Funk, Carnes and Royer, on the contrary, is plain and straightforward, and we accept it as true, except as to the intent of the bill of sale given to Cole, and assuming, therefore, the testimony of these witnesses to be true in intent, we will consider the main elements of the case upon that hypothesis.

When Manning came to Cole on March 11, 1925, and stated that he would have to sell the yearling lambs, which then constituted a very small portion of the Cole band and of which he was the lessee on shares, it was manifestly to Cole's interest, or at least it seemed to be in his interest, to retain the lambs in the herd, and he therefore preferred to make some arrangement so as to keep them where they were and stated to Manning, as Manning seemed determined to sell on account of financial inability to carry them, that he would buy them so as to keep the herd intact. The bill of sale was drawn by Mr. Funk, who, on account of Cole's blindness, generally acted as his amanuensis, and the same was placed at

his request with his other papers in Funk's office. A payment or advance of $200 was made at the time and a note given by Manning for the amount. The agreement between Cole and Manning was that the lambs were to be paid for at the going price in the spring. Later on, Cole let Manning have another $100, and about May, 1926, he paid to one Allenburger, at Manning's request, the sum of about $400 for range and hay owed him by Manning and at about the same date, Manning proposed to take $8 a head for the lambs and a settlement was had on that basis. There had been advances prior to the bill of sale, and these were figured and included in the total of Manning's liabilities to Cole, and it was agreed that there was a small balance in Cole's favor so far as the lamb item was concerned, and the account was practically closed. About the same time, Manning told Cole that he was about all in and his credit was exhausted, and asked to be put on a salary. On May 20th, Cole put Manning on a salary of $75 per month, as he claims, for handling another small band of Cole's sheep in a neighboring locality, but, as Cole claims, for services as superintendent or boss herder of both camps. Manning denies much of this, which is substantially Cole's account, but, as before stated, we have little confidence in anything Manning says in his own interest except where it is corroborated by circumstances. Cole, on May 20th, gave Manning a check for $75, being his salary from May 20 to June 20, 1925, and arranged with a firm at Pilot Rock to furnish Manning with supplies for the two camps on Cole's credit.

The bill of sale does not describe the sheep, except as 150 yearling ewe lambs. No marks or brands are mentioned, nor is the locality, where they were

118 Or.—43

being ranged, designated. So far, we have taken Cole's testimony as being in intent truthful, but, through it all, there is in the background that which indicates that the bill of sale was not given, or intended to be given, as an absolute transfer of all Manning's interest in the sheep. The taking of notes for the money advanced at the time of the transfer, and afterwards, indicates that, in Cole's mind, Manning still had some remote or contingent interest in the sheep. In answer to a question by his counsel, as to how he came to permit Mr. Manning to sell the sheep to the Falconer-Hoke Trading Company, he answered:

"I was out there and he had been telling me Falkner wanted to buy them. I said, 'If he wants to buy them and we can sell them so as to clear up, you clear up and myself, we will sell them.'

"Q. Then it was your intention to give him any benefit of any profit?

"A. No. I didn't ask for any profit only just to clear myself."

The particular conditions, under which Manning held the sheep and under which he, with Cole's consent, contracted to sell them to the Falconer-Hoke Trading Company, while heretofore alluded to in general terms, deserve special consideration here.

After the contract or lease of 1924 had expired in the fall of that year, and matters had been adjusted to the satisfaction of both parties, on November 1st of the same year, the parties entered into a new contract, the importance of which seems to the writer, to justify the insertion of it in full contrary to his usual custom of merely stating the legal effect of like documents. The contract is as follows:

"This agreement made this 1st day of November, 1924, by and between A. A. Cole, of Pendleton, Umatilla County, Oregon, and Robert E. Manning, of Pilot Rock, Umatilla County, Oregon, Witnesseth:

"That whereas said Cole is the owner of 782 stock ewes, varying in age from one year to seven years, and 84 stock lambs, which the said Manning desires to purchase, and whereas it is agreed that the purchase price shall be as follows, to-wit: 314 of the ewes at $11.25 per head, 468 ewes at $7.25 per head, and 84 lambs at $6.50 per head, making a total of $7,459.50, with interest on deferred payments at the rate of 8 per cent per annum, and whereas the said Cole is willing to contract to sell said property at said price to said Manning, the owner to retain title until full payment has been made.

"And whereas the said Manning is unable to pay for said animals at this time.

"It is therefore agreed that said Cole now leases all said property to said Manning for the period of one year, beginning November 1, 1924, and ending November 1, 1925, with the understanding that at any time during the said year said Manning may purchase said property upon the terms and conditions and at the price herein set forth, namely, at the agreed price of $7,459.50, with interest thereon at the rate of 8 per cent per annum from November 1, 1924. No title, however, to pass to said Manning until the full purchase price has been paid.

"It is likewise agreed that none of the increase passes from the ownership of said Cole until the full purchase price aforesaid shall have been paid, but that the said Manning shall have the wool grown upon said animals and shorn therefrom in the season of 1925, but shall have no other interest whatsoever except the right which he has to make purchase as herein provided.

"And the said Manning covenants and agrees as follows:

"That he will immediately take possession of said animals and care for them in a good husbandlike

manner, at all times during the life of this lease, and that he will see that they are properly pastured and cared for both in summer and winter, and that they are sufficiently and properly fed and watered at all times, and that they receive proper care and medicine in the event of sickness, and that he will herd and care for and shear the animals at the proper season for the year 1925, and that at lambing time he will give the ewes and the young lambs good and sufficient and proper care in accordance with the best custom of sheep men in Umatilla County, Oregon, and that he will shelter and watch over the new lambs in that manner which is required by good sheep men in said locality, and will use every effort within reason to keep all the animals and their young in good and healthy condition during the life of this lease.

"It is further agreed that unless this lease is continued, or unless said Manning is able to pay, and does pay, the purchase price within the year provided, he will at the expiration of this lease return the animals and their increase to first party in as good condition as the same now are, natural losses alone excepted, and will return likewise the increase of the animals at the same time to said Cole. Taxes assessed on said animals in 1925 to be paid by Manning.

"Said Manning promises and agrees that in the event that he exercises the right to purchase hereunder, to pay to said Cole on or before one year from November 1, 1924, said sum of $7,459.50 with interest at the rate of 8 per cent per annum from said date until paid, and in the event that suit or action be instituted for any purpose under this contract, that he will pay such reasonable sum as the court may adjudge as attorney fees in said suit or action.

"It is further understood and agreed that if the said Manning fail or neglect in any particular to keep and perform any of the covenants herein made incumbent upon him, or if he shall fail or neglect in any manner to properly care for and watch over

and protect said animals at all times in accordance with the best custom of sheep men in Umatilla County, or if the said Cole deems himself to be in danger of loss by reason of any neglect on the part of said Manning, then this contract may be cancelled by said Cole and he may take possession of the animals and their increase, and oust the said Manning therefrom and that this contract shall then be at an end, all without incurring liability or trespass or damage.

"It is further agreed that the increase of said animals shall, in any event, whether purchase be effected as herein provided or otherwise, be retained by said Cole as his own until the full payment to him by said Manning of the sum of $800.00 rental on certain grazing lands covered by a written lease of even date herewith, and full ownership and title in said increase is hereby retained by said Cole, and admitted by said Manning, said lease being hereby referred to for information."

1. It will be seen by this exhibit that Manning was given possession of the sheep with an option to purchase at prices therein named at any time before November 1, 1925, subject to stipulation as to care, *et cetera,* and subject to the payment of $800 rent for the land upon which they were to be ranged, and other specifications shown in the foregoing copy of the lease and contract. It is noticeable that nowhere was a forfeiture of this option claimed by Cole, although he does claim that the lease was verbally forfeited; but he impliedly recognized it as still existing, by permitting Manning to contract for sale of the sheep in his own name and merely adding to Manning's contract a sort of postscript thereto giving his consent. It is to be noted here that in the contract between Manning and the Falconer-Hoke Trading Company for the sale of the sheep there is

also a contract for a lease to them of the land leased by Manning from Cole in the option-lease contract of 1924, said sublease to Falconer-Hoke Trading Company being until November 1, 1925, the date of the expiration of the option lease from Cole to Manning, a copy of which lease was attached to and made a part of the contract of sale from Manning to the Falconer-Hoke Trading Company. Cole's consent to the contract of sale from Manning to the Falconer-Hoke Trading Company is significant. It is as follows:

"I, A. A. Cole of Pendleton, Oregon, do hereby certify that I have full knowledge of the within mentioned contract and that I have given my consent to the Party of the First Part to sell these sheep in accordance with this contract and that I do hereby agree to accept notes and mortgages as provided in this contract from the Falconer-Hoke Trading Company said notes and mortgages being given as part of the purchase price of these sheep to R. E. Manning it being understood on my part that the Falconer-Hoke Trading Company will not give me notes aggregating more than the sheep named in the within contract will come to at the agreed prices less the $400 already paid. And I further certify that that certain lease mentioned in this contract between A. A. Cole and R. E. Manning is fully paid up."

Taking the evidence as a whole, we are inclined to the opinion that, at the time it was given, it was not intended by the parties that the bill of sale should be absolute, but rather as a security for present and future advance to be repaid from the proceeds of the sale of the sheep when consummated. At the time Cole accepted the bill of sale, he had an intimation from Manning that he was out of money. He "was up against it," to quote Cole's own account of what

Manning told him.  To let these high-priced yearlings
go out of the herd might materially interfere with
a sale later on, so he advanced $200, taking a note
for it and taking the alleged bill of sale evidently
thinking that this would secure him for the original
advancement, and for such advances as he might
subsequently be called upon to make before he could
be reimbursed by the sale of the sheep.  As between
the parties, it was a good transfer, and although not
entitled to record and being very indefinite as to
description, it was in effect a chattel mortgage in
every respect except as to acknowledgment.

It is safe to say that had Cole gone to his attorney
to have the negotiations between himself and Man-
ning reduced to writing, the bill of sale, or chattel
mortgage, or whatever the parties intended, would
have been in a far different shape, and the transac-
tion divested of those indefinite features, which have
caused this lawsuit.   Doubtless, there would have been
some visible change of possession, or change of marks
or brands, or something, which would have been an
indication to inquirers that Manning's lambs, if a
sale had been intended, had become the property of
Cole, or, if only a giving of security had been the
purpose, a chattel mortgage regular in form would
have been executed and recorded.  While an insur-
ance agent may serve as a secretary or bookkeeper,
it does not follow that he is a safe legal adviser, al-
though it is fair to say that there is no evidence here
that Cole asked the advice of Mr. Funk beyond direct-
ing him to draw up a bill of sale.

2.   So, here is the situation as between Cole and
Manning up to June 10, 1925.  Manning is in actual
possession of the whole herd of sheep including the
150 head pledged, or as Cole contends, sold to Cole

with Manning's brand "M" on every one of them with an unexpired and uncontested option to purchase them, and stealthily, without the knowledge of Cole, being piled up with personal indebtedness that could only be wholly met by a sale of the herd for more than his indebtedness, and being pressed, Manning dishonestly executed the chattel mortgage to plaintiffs. Cole having had satisfactory dealings with Manning the season before, evidently trusted him and thought it unnecessary to have a recordable security, or a visible change of possession, and relied upon Manning's integrity. Plaintiffs, also relying upon Manning's integrity and with the vague understanding that he had some lambs on Cole's ranch, took his word for it and took a mortgage on the same lambs upon which Cole had a secret claim. It is true that there is a misdescription as to the earmarks, but the lambs were described as to their locality,—on the "Aaron Cole Ranch." They were all the lambs that Manning ever had and for that matter, it seems probable they were all the yearling lambs in that particular herd. The mortgage describes them as being branded "M" on the back. The description is faulty in describing the lambs as having a "split in the left ear," when, as a matter of fact, none of them were so marked, a part of them being distinguished by a "crop off of both ears" and others being "slick ears," but it is evident that there were, at the date of the chattel mortgage, no more than about 150 yearling ewe lambs in the herd, so the earmark may be disregarded and there still remains an identifiable description. There was some testimony to the effect that these particular lambs could be identified by the quality of their wool, but it rests mainly upon the testimony of Manning, which is very badly damaged goods. His wife, who

we think intended to tell the truth, thought she could so identify them, but we fear that in her loyalty to her husband, she overestimated her capacity in that regard.   Another witness did not know what particular lambs he was talking about, and as the evidence introduced on behalf of defendants renders such a means of identification exceedingly doubtful, we are not inclined to accept it, but outside of this we are still of the opinion that the mortgage taken in connection with the inquiries it naturally suggests is sufficient to identify the Manning band.   In fairness to Manning, it may be said that there is evidence of a shortage as to the kind and grade of lambs described in the bill of sale, which might have led Manning to believe that there was a sufficient number of lambs to pay both debts in full, but this is merely a surmise not rising above the suspicion of Cole that Manning might have "held out" or otherwise disposed of the lambs involved in the supposed shortage.   The fact remains that there is an unexplained shortage of yearling ewe lambs, which Manning does not attempt to account for.

The case is a hard one and has consumed much time and labor in its examination, but it resolves itself, in our judgment, to the proposition of a secret lien on the part of Cole in opposition to a recorded chattel mortgage on the part of plaintiffs given by the person in actual physical possession of the property, and, taken as a whole, we believe the equities to be with the plaintiffs.   We agree with the able circuit judge, who filed a written opinion in this case, that in doubtful cases, open and recorded transactions should be favored in preference to those secret in their nature.

That Cole has been shamefully victimized by one in whom he had such confidence as to omit precautions, and which he would never have placed in a stranger, is evident, but we feel ourselves legally prohibited from protecting him at the expense of plaintiffs, who acted in good faith and in ignorance of his secret claim upon the property.

3. It is urged that there is no proof that the chattel mortgage was ever recorded, but, in the condition of the pleading, such an allegation was unnecessary. The complaint alleges in positive terms that the mortgage was duly recorded on June 10, 1925, the date of its execution, on page 500 of the records of mortgages of Umatilla County, and the answer alleges want of information or knowledge sufficient to form a belief as to whether it was so recorded. Denial of knowledge sufficient to form a belief, as to whether an instrument alleged in the complaint to have been actually recorded, is, as a matter of law, no denial, and the allegation in the complaint will be taken as admitted.

4. There is another matter incidentally arising here, which we think should be noticed in order that complete equity should be done in the premises. In the chattel mortgage from Manning to plaintiffs, in addition to the lambs here in controversy, there was also included the following:

"23 registered bucks two and three years old each branded M on the back and being all of the bucks now owned by the mortgagor. * * Also 7 head of mares, 1 horse colt and 1 mule colt, being all the horses now owned by the mortgagor, * * . Also 2 cows, etc."

All of said property was sufficiently described in the mortgage. The plaintiffs are and were in a posi-

tion to make this property available in the reduction of their claim against Cole while he has no standing himself to enforce independently any lien against them. There is no prayer in respect to this property in the pleadings, but equity would dictate that plaintiffs should not be allowed to collect their whole claim out of the sheep in controversy when they are in a position to realize a portion of it out of remaining security. We think the arm of equity is long enough to reach this property and direct that it be sold upon foreclosure of plaintiffs' mortgage, the proceeds of it to be deducted and applied to the reduction of plaintiffs' claim, and that when such proceeds are so applied, plaintiffs should have a judgment in the circuit court, at the foot of the decree, for any balance which shall remain on the judgment heretofore rendered against defendant Cole. The decree is therefore modified in the respect last mentioned. Otherwise, it is affirmed. The costs and disbursements awarded in the lower court will stand, but neither party will recover costs upon this appeal.                MODIFIED. REHEARING DENIED.