Argued September 16, 1942; modified June 2; rehearing denied
November 16, 1943

# FIRST NATIONAL BANK OF PORTLAND *v.*
## CONNOLLY ET AL.

(138 P. (2d) 613, 143 P. (2d) 243)

Before KELLY, Chief Justice, and BELT, BAILEY, LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

*Robert A. Bennett,* of Portland (Cake, Jaureguy & Tooze, of Portland, on the brief) for appellant.

*Ralph E. Moody,* of Salem (Gavin & Gavin, of The Dalles, on the brief) for Anthony J. Connolly and Ann Connolly, respondents.

*Collier, Collier & Bernard,* of Portland, for Patrick H. Connolly and Kathleen Connolly, respondents.

*Frank G. Dick,* of The Dalles, for Eastern Oregon Banking Co. and others, respondents.

LUSK, J. 1. *Were moneys belonging to Joseph J. Connolly converted by Thomas A. Connolly?*

A brief account of the history of the Connolly family, as disclosed by the record, will furnish a background for the disputed transaction. Thomas, the eldest of the boys, came to this country from Ireland in 1902, or thereabouts, and established himself in the sheep business in eastern Oregon. He prospered and even-

tually acquired thousands of sheep and many thousand acres of land in Wheeler, Deschutes, Sherman and Wasco counties. His operations were on an extensive scale. His younger brothers, Anthony, Patrick, John, Steve and Joseph, followed him to this country, as did his sisters, Mary Ann (Mrs. Arthur Hillgen) and Elena (Mrs. J. F. Zimmer). He paid their traveling expenses, and they all went to work for him. There remained at home in Ireland his mother and a sister, Margaret. In 1917, 1918 and 1919 Anthony took over the business established by Thomas and operated it under a lease agreement with the latter; but during most of the period with which we are concerned Thomas and Patrick were partners and were such at the time of Thomas' death in 1935, at which time and for some years previous thereto Anthony was the manager of the business. Joseph came to this country in 1907 when he was between twenty-five and thirty years of age, and from the time of his arrival in Oregon until his death in 1927 worked for Thomas as sheepherder and camp tender, except during the three-year period 1917 to 1919 that Anthony was operating the business, during which time he was employed by Anthony.

The evidence shows that Thomas stood towards his brothers and sisters very much as a kind and generous father towards his children. He was the patriarch of the family. As his brother Steve testified: ''Tom Connolly was one of the best men I ever knew of for his family, for his sisters and brothers—the same as a father to them all the time.''

Thomas transacted most of his banking business with Eastern Oregon Banking Company at Shaniko, in which he was a stockholder and director. In April, 1919, at a time when his affairs were prospering and he could be counted a rich man, he received from one J. H.

Priday the sum of $5,528.67 in payment of a loan which he had theretofore made to Priday, and on April 30 he caused an account to be opened with the bank in the name of Joseph Connolly and deposited in that account to Joseph's credit the amount which he had received from Priday. It is this fund with its accretions that is the subject matter of this suit. J. W. Hoech, at that time cashier of the bank, testified to a conversation with Thomas before the Priday note was paid. He swore:

> "Well, I was talking to Tom one day about some Shaniko city warrants that was coming up for sale, and he said that he had money that wasn't working and he would like those, and that note was paid and I put it in the name of Joe Connolly to buy the warrants for him, that is, warrants for the city of Shaniko that was issued."

The account remained open until May 1, 1928. Joseph died intestate on March 8, 1927. Between these dates there were numerous withdrawals from, and deposits to, the account, all at the direction of Thomas. Apparently no checks on the account were written by him, but he gave directions to charge the account and memorandum charge slips were issued. A duplicate of the original deposit slip was mailed to Joseph by the bank, as were duplicates of subsequent deposit slips and "advices of charge" and monthly statements of the account. Joseph was not known personally, however, to the bank's officers; he drew no checks on the account; and the bank did not have his signature as a depositor. In accordance with its usual practice the bank, which transacted most of its business by mail, issued no passbook when the account was opened.

Thomas Connolly's method of treating this account evidenced a clear intention to keep the fund which it represented intact; more than that, it indicates that he

regarded it as a trust fund. Every withdrawal up to the time the account was closed was made for the purpose either of a loan or of investing moneys in warrants of the city of Shaniko, and the proceeds of these loans and investments, principal and interest, upon repayment, were returned by Thomas to the Joseph Connolly account. The only other deposits were one for $765.67, a check payable to Joseph Connolly issued by Kedwell and Caswell, a livestock commission firm located in North Portland, and a check for $45 drawn on Eastern Oregon Banking Company by Thomas Connolly.

Among the withdrawals were the sum of $1,228.25 on January 19, 1923, and the sum of $2,000 on July 13, 1925. These withdrawals were made in favor of Thomas, and in each instance he executed and left with the bank his promissory note payable to Joseph for the amount thereof, and on April 28, 1927, he deposited in the Joseph Connolly account $3,927.67, evidently the repayment of these loans with interest. The date of this deposit was more than a month and a half after the death of Joseph.

As illustrative of how these matters were handled, we set forth a copy of an exhibit relating to the withdrawal of January 19, 1923.

*"Advice of Charge*
"Jan. 19, 1923

This is to advise you that we have this day charged your account in this bank $1228.25 as follows: note made in your favor by Thos. A. Connolly.

To Joseph Connolly'
Address Maupin, Ore.

"Approved by
J. W. Hoech,
Vice Pres."

Two loans were made from the account of Steve Connolly—$1,000 on January 23, 1920, and $2,000 on January 28, 1921. The bank's record of the account, which is in evidence, shows that Steve made two interest payments amounting to $800, but does not show any payment of principal. Steve testified that he applied to Mr. Hoech, then cashier of the bank, for a loan of $3,000; that Hoech told him that he was up to his limit at the bank, but that Hoech would lend him $3,000 of Joseph's money, and that was done. Subsequently, according to Steve Connolly's testimony, he told Joseph of the transaction, and Joseph said "he didn't know he had the money there. He said that he heard he had some money there. He wasn't sure whether it was there or not; he didn't know whether it was loaned out or not." According to Steve's testimony, he paid back the loan about a year or two after Joseph died, and he produced a cancelled check for $3,260 dated September 7, 1929, payable to Eastern Oregon Banking Company, which he testified at first was given in payment of the loan from Joseph's money. On being pressed, he admitted that he could not be sure of the correctness of his recollection of the matter.

On May 1, 1928, at Thomas' request, the Joseph Connolly account, which then amounted to $5,909.20, was closed, and in place thereof a time certificate of deposit was issued by the bank payable to "Joseph Connolly Est." A. R. Altermatt, vice president of the bank, who handled this transaction, testified that he made the certificate payable to the estate of Joseph Connolly of his own volition and not at the direction of Thomas, because that was customary when a depositor had died. On April 25, 1930, a new time certificate of deposit was issued in place of that dated

May 1, 1930, payable to Joseph Connolly, in the sum of $6,378.65, the original amount plus accumulated interest. This certificate was delivered by the bank to Thomas, who endorsed it "Joseph by Thomas A. Connolly", and on September 10, 1930, deposited the proceeds, $6,463.58, together with other moneys, in his own account.

This transaction is reflected by a deposit slip dated 9-9-1930, headed "Deposited by Thos. A. Connolly" and containing the following items:

| | |
|---|---:|
| Cr. 96-40 | $6,191.68 |
| Joseph Connolly Estate C. D. | 6,378.65 |
| Int. to date | 84.93 |
| | $12,655.26 |

It was not until the year 1938 that the mother in Ireland—Joseph's sole heir at law—learned of her son's death. That information was withheld from her purposely, not, as the evidence clearly shows, from any wrongful or sinister motive, but because the members of the family in this country felt that Mrs. Connolly, being old and in poor health, should not be subjected to the shock of the news of her son's death. The daughter in Ireland, Margaret, was advised of Joseph's death by letter, but she was instructed not to tell her mother, and she did not do so. In 1938 John went to Ireland on a visit to his old home, and at that time informed his mother of the death of Joseph. Mrs. Connolly died in December, 1938, at the age of ninety-three.

On April 6, 1934, Thomas wrote a letter to his sister, Margaret, which in part reads as follows:

"About he who is gone and suppose you mean what he left I think I told you and how I thought I would dispose of it and looked into it when I came back. I found the Oregon government would

take 25 per ct of it for inheritance tax and the United States inheritance tax 25 per ct So that would take half of it & I thought it would be too bad to give half of it away and I knew I would never hear the last of it So I thought I could get around that or the law would be changed which they are doing every Session of Congress. I invested it in Bank Stock and insurance Stock with my own money inside of a year they were broke and I lost my own as well as the other I lost over 75,000.00 Seventy five thousand Dollars but I am not broke thank God and will pay it back if and when I make (it) and things are looking good and I hope it wont be long. you speak of what we could have done if thing were diferent you ought to know that you could not give to one and have the others on your neck that was why I did invest it as I did and I am sorry I didnt give what I could then and every one take there loss. it is easy for people to talk especially when they dont know. Where there was 20 banks there (is) one now. So you see how many is opened. I was in three and only one is partly open the others never will open.'' (For purposes of clarity some misspelled words are corrected in the above and the words in parentheses are supplied.)

At the time this letter was written none of the Connolly brothers or sisters had died except Joseph.

■ The foregoing is, in substance, the evidence relied upon by the plaintiff to establish its claim that the moneys in the account to the credit of Joseph belonged to him and were converted by Thomas. We think it must be so held.

■ The *prima facie* presumption is that a fund deposited in a bank belongs to the person in whose name it has been deposited, and the burden of proof is upon another claiming such fund. 5 Michie, Banks and Bank-

ing, 710, § 368b; *Egbert v. Payne,* 99 Pa. St. 239, 244; *O'Brien v. Radford,* 113 Pa. Super. 88, 91, 171 Atl. 296; *Johnson v. Commercial National Bank,* (La.) 175 So. 852; *Detroit Savings Bank v. Haines,* 128 Mich. 38, 42, 87 N. W. 66; *U. S. Fidelity & Guaranty Co. v. First National Bank of Forth Worth,* (Tex. Civ. App.) 81 S. W. (2d) 213; *Meyer v. Meyer,* 124 N. J. Eq. 481, 483, 2 Atl. (2d) 467.

■ In the present instance, this presumption is rendered all but conclusive by the evidence of the manner in which Thomas handled the moneys in the account. As we have already stated, he treated them as a trust fund, returning to the account the proceeds of the loans and other investments which he caused to be made therefrom. He borrowed money from the fund himself, and left his promissory notes with the bank payable to Joseph, and later repaid the loans with interest. Men do not borrow their own money—least of all do they give promissory notes for the repayment of money borrowed from themselves, and, on top of that, pay interest to themselves on the loan. No fact has been developed nor any explanation offered which will reconcile these acts with ownership of the fund in Thomas.

It is argued that the original deposit was Thomas' own money, the proceeds of a loan made from moneys in his personal account at the bank; that the testimony of Mr. Hoech, above quoted, indicated his purpose in opening the account in Joseph's name; and that there is no sufficient evidence either that Joseph could have accumulated such a sum or of a valid gift *inter vivos.*

There is no necessary inconsistency between Hoech's testimony and the view that the money belonged to Joseph. It does not suffice, in our opinion, to over-

come the strong inferences arising from Thomas' conduct in his handling of the fund. In any event, we think that Mr. Hoech, testifying to his recollection of a transaction twenty years old, was mistaken, because the investment in City of Shaniko warrants was not made until more than a year and four months after the deposit, and in the meantime three loans were made out of the fund.

The plaintiff maintains that Thomas opened the account as a payment of his indebtedness to Joseph for wages. There are circumstances which give color to this theory. It is shown that it was Thomas' habit not to pay his brothers' wages regularly, but to let the accounts run for long periods. John Connolly presented a wage claim to the administrator for services as a herder over a period of twenty-two years, which was settled for $15,300. Anthony's claim, which exceeded $37,000, was for an accumulation of wages. The testimony would support a finding that Joseph's wages averaged $50 a month for the ten year period before 1919 that he worked for Thomas, and, as he was thrifty and of frugal habits, unmarried, and had no expenses except for such clothing as he might need, it is not inconceivable that, with a fair rate of interest, his credit for accumulated wages could have amounted to $5,200 in 1919. The letter which Thomas wrote to his sister Margaret in 1934 could have referred to no one but Joseph—he was then the only one of the family "who is gone"—and is a declaration by Thomas that he had lost money belonging to Joseph in bad investments and considered himself obligated to pay it back.

If, however, it were to be said that the evidence on the subject of Joseph's earnings is too indefinite and uncertain, then we think that the conclusion is

impelled that Thomas made a gift of the fund to his brother. The requisites of a completed gift *inter vivos* have been frequently stated by this court. We need quote but from two of our decisions:

> "The essential elements of a gift *inter vivos* are, (1) a donor competent to contract; (2) freedom of will of donor; (3) the gift must be complete and nothing left undone; (4) the property must be delivered by the donor and accepted by the donee; (5) the gift must go into immediate and absolute effect". *In re Norman's Estate,* 161 Or. 450, 475, 88 P. (2d) 977.

> "To consummate a gift there must be a transfer of possession and of the dominion over the subject of the gift." *Lay v. Proctor,* 147 Or. 545, 560, 34 P. (2d) 331.

The question whether the deposit of money in a bank by one person in the name of another constitutes a gift has been frequently before the courts, though, as far as we are aware, it has arisen in this state but once. That was in *Lay v. Proctor,* supra. But the case is of no value for our present purposes because there the claimant, in whose name money had been deposited by her mother, admitted that she never drew against it except with her mother's consent. The element of transfer of dominion over the subject of the gift was therefore completely lacking.

■ It is established law that a gift *inter vivos* may be made by the deposit of money in the bank to the credit of another, though the mere fact of the deposit, without other evidence manifesting an intention to make a gift and the delivery and acceptance thereof by the donee, is not sufficient. 28 C. J., Gifts, 662, § 63; 24 Am. Jur., Gifts, 782, § 101. As observed in the cited section of

Corpus Juris it "may have been done for any one of a number of reasons, each without donative purpose."

Many of the cases deal with deposits in savings accounts. Of these, it is said in the annotation in 59 A. L. R. 975:

"In most of the cases which have denied a completed gift, it will be observed the deposit was in a savings bank, and the pass book, without which presumably the deposit could not be withdrawn, was kept by the depositor; or the deposit was evidenced by a certificate of deposit retained by the depositor; or it appeared that the depositor did in fact, by some arrangement or understanding with the bank, reserve control over the deposit; or other circumstances tended to negative an intention to make a gift. It may be observed that a case involving a deposit in a savings bank (assuming that the account cannot be drawn against without the book) is somewhat less favorable to the donee's contention, than is a case involving a deposit on a checking account in a commercial bank, not only in respect of the element of delivery, but also in respect of the element of intention, since the retention of the savings bank book in the depositor's control carries an unfavorable inference as to his intention, in view of his knowledge that the account could not be drawn upon without the possession of the book."

See cases digested following the foregoing text, pp. 976–979.

■ However, the delivery of the money to the bank under circumstances—whether acts or declarations—showing that it was intended as a gift to the person in whose name or for whose benefit it is deposited, is a sufficient delivery, the bank being regarded as the agent of the donee. *Minor v. Rogers,* 40 Conn. 512, 16 Am. Rep. 69; *Hallowell Savings Institution v.*

*Titcomb,* 96 Me. 62, 51 Atl. 249; *Gardner v. Merritt,* 32 Md. 78, 3 Am. Rep. 115; *Howard v. Windham County Savings Bank,* 40 Vt. 597; *William v. Smith,* 66 Ark. 299, 50 S. W. 513; *Goelz v. People's Savings Bank,* 31 Ind. App. 67, 67 N. E. 232; *Boyle v. Dinsdale,* 45 Utah 112, 143 P. 136, Ann. Cas. 1917E, 363; *Eastman v. Woronoco Savings Bank,* 136 Mass. 208. See, Note, 3 A. & E. Ann. Cas. 865.

██ The circumstances which persuade us that a gift was intended are that the bank, presumably under the direction of Thomas A. Connolly *(Howard v. Windham County Savings Bank,* supra), sent a duplicate deposit slip—in this instance the substitute for a passbook—to Joseph J. Connolly, showing the opening of the account, and thereafter kept him advised of the withdrawals from, and deposits in the account; that there were no withdrawals save for purpose of investment, and all the investments when paid were returned to the account with interest; that the withdrawals included two by Thomas A. Connolly, for which he gave his promissory note payable to Joseph, later repaying the loans with interest; that he never withdrew any money for himself until after Joseph's death; and that there is no evidence in the record, nor the slightest reason for believing, that Thomas had any purpose of his own to subserve in keeping his own money in Joseph's name. These facts, together with the almost parental relationship of Thomas toward his younger brother, satisfy us that if the money belonged to Thomas he intended to give it to Joseph. The rule that less evidence is required to establish delivery of a gift from a father to his children than where no such relationship exists, it seems to us, might well be applied to this case. See *Love v. Francis,* 63 Mich. 181, 29 N. W. 843, 6 Am. St. Rep. 290.

■ It is argued by the defendants that the evidence establishes that Thomas retained the absolute control of the bank account. Of course, if he did there was no gift. But what was the nature of that control? Was it the sort of dominion or control that one exercises over his own money? We think that clearly it was not, but it was of the same sort that an agent exercises on behalf of his principal or a trustee on behalf of his *cestui que trust*. The whole course of conduct of Thomas A. Connolly relative to this account, up to the final act, after Joseph's death, when he caused the money to be transferred to his personal account, was that of a man disclaiming any interest of his own in the fund. The evidence could scarcely have been stronger had it been shown that he stated to the banker at the time he opened the account: "I am giving this money to my brother, and he wishes me to invest it for him." The case is analogous to one where a gift has been completed and there has been a subsequent redelivery of the subject matter of the gift to the donor to keep for the donee. *In re Norman's Estate,* supra, 161 Or. at p. 475. It is also analogous to the state of facts found in *Gardner v. Merritt,* 32 Md. 78, 3 Am. Rep. 115, where a grandmother deposited money in a bank to the credit of her grandchildren "subject to the order of Susanna A. Merritt or Sunsanna Merritt." Susanna Merritt was the daughter of Susanna A. Merritt. The contention was made that these words of the deposit explained and limited the acts of deposit to the effect of a declaration of an intent to give in the future. There was a by-law of the bank which permitted deposits to be made by parties for the benefit of their children, and, if desired at the time of deposit,

that it be subject to the control of the parents. The court held that the control retained by the grandmother or her daughter was such as was contemplated by the by-law and was for the benefit of those to whose use the money was delivered, for the protection of their interest, and of the same nature as a guardian might exercise for the benefit of his ward, but was not such control as would pertain to a continuing legal power and dominion over it and which would leave the donor a *locus poenitentiae*.

In the cases cited above, in which the courts have held that there was a completed gift, there was usually evidence of some declaration on the part of the donor of his intention to make a gift. In that respect they differ, of course, from the instant case. But we think that Thomas Connolly expressed his intention to give this money to Joseph by conduct quite as clear as any language, and the proof of which is not made to depend on human memory. This case, in truth, is on its facts unique, but it would become entirely unexplainable if the defendants' position were to be sustained. As we have said, there is nothing to suggest a motive— such, for example, as the concealment of assets—for Thomas' keeping his own money in Joseph's name. The circuit judge, it is true, in an able memorandum opinion denying relief to the plaintiff, evolved the theory, which the defendants adopt in their brief, that Thomas, at the height of his prosperity put aside this fund for Joseph, who was not as well circumstanced as the other brothers and not in the best of health, with the idea that Joseph might need material assistance later on; but, anticipating a possible unfavorable turn in his own fortunes, Thomas left the fund in such condition that he could draw on it and use it himself

if necessary, and that in the end this is what actually occurred. It is said, "If Thomas Connolly's prosperity continued and Joseph had still been a recipient of his affections, and Thomas Connolly had died before Joseph, undoubtedly Joseph would have received the money deposited to his account."

■ This explanation, ingenious and plausible though it may be, does not square with the facts, nor is it sound in law. It does not account for Thomas Connolly paying interest on his own borrowings from the fund, nor authorizing the bank, as he must have done, to treat Joseph as the depositor. It is wholly inconsistent with Thomas Connolly's acts, after Joseph's death, in depositing in the account $3,937.63, the repayment of his own notes with interest, and in accepting a certificate of deposit payable to the estate of Joseph Connolly. Finally, if Thomas had died first, Joseph would not have been entitled to the money because, under the suggested theory, there would have been no gift *in praesenti,* but only an invalid attempt to make a testamentary disposition of the fund. In that event Joseph, in the eyes of the law, would have been in no better case while living than, according to the defendants' view, his administrator now is after his death.

The defendants, in their brief, assert that a valid gift *inter vivos* is not effected by the mere deposit of funds in an open checking account in a bank in the name of another who has no knowledge of the transaction until after the death of the depositor, and cite *Peters' Administrator v. Peters,* 224 Ky. 493, 6 S. W. (2d) 499, 59 A. L. R. 969, and *Rose v. Osborne,* 133 Me. 497, 180 Atl. 315. There may be some questions as to the entire soundness of the legal propositions as thus

stated. Referring to the Peters case the annotation in 59 A. L. R. at p. 975 says:

"None of the cases cited, however, seems to go as far on the facts as does the reported case in denying a gift where the deposit was on a checking account, and, so far as appears, there was in fact no attempt by the depositor (alleged donor) to reserve dominion or control over the deposit."

See, also, 24 Am. Jur., Gifts, 783, § 102.

██ ██ However that may be, the rule invoked has no application to this case because the evidence shows that Joseph Connolly was informed of the deposit. The duplicate deposit slip took the place of the passbook which banks ordinarily issue to the depositor upon the opening of an account. It was mailed to Joseph, and presumably he received it. There is nothing to show that he did not. See *Sparks v. Hurley,* 208 Pa.166, 57 Atl. 364, 101 Am. St. Rep. 926, which, while not a case of a bank account, is, in some of its features, highly analogous.

The other case cited by defendants, *Rose v. Osborne,* supra, involved three savings accounts. As to one the claim of creation of a legal voluntary trust was sustained. As to the other two it was held that gifts *inter vivos* of the moneys in the accounts had not been proven. In one the alleged donor retained the right to control the bankbook, and made two withdrawals from the account for the purpose of making loans without the knowledge of the claimant, the notes being payable to the alleged donor alone. In the other a memorandum signed by the parties and left with the bank at the time of opening the account empowered both of them to draw on the account. The court held, in each instance, that the alleged donor had not parted with dominion over

the property. Upon the basis of the controlling facts, we think the case is not authority supporting the defendants' position.

The only remaining question on this branch of the case is whether Joseph accepted the gift. There is no affirmative evidence on the subject, apart from the rather vague and inconclusive testimony of Steve Connolly which we have quoted. But he was informed of it; there is nothing to show that he rejected it; and, since it was for his benefit and carried no burdens with it, the presumption is that he accepted it. An acceptance of the gift will be presumed where it operates entirely for the donee's benefit: 24 Am. Jur., Gifts, 792, § 117; *In re Stockham's Estate,* 193 Iowa 823, 186 N. W. 650, 22 A. L. R. 765; *Sparks v. Hurley,* supra; *Donohoe's Estate,* 271 Pa. 554, 115 Atl. 878, 20 A. L. R. 392; *Goelz v. People's Savings Bank,* supra; *Walso v. Latterner,* 140 Minn. 455, 168 N. W. 353; *Helmer v. Helmer,* 159 Ga. 376, 125 S. E. 849, 37 A. L. R. 1137 (by statute); *Gottstein v. Hedges,* 210 Iowa 272, 228 N. W. 93, 67 A. L. R. 1218; *Olds v. Powell,* 7 Ala. 652, 42 Am. Dec. 605.

A number of Oregon cases on the subject of gifts, besides those to which we have already referred, have been cited by the defendants, but, as the factual situations they present are widely different from that in the case at bar, nothing is to be gained by discussing them.

In our opinion, Thomas A. Connolly's act in causing the fund in question to be transferred to his personal account to be used for his own purposes constituted a misappropriation of the fund and rendered him liable to the estate of Joseph J. Connolly as a trustee *ex maleficio.*

2. *Was Eastern Oregon Banking Company a party to the conversion?*

■ As against the claim of the plaintiff that it was a participant in the breach of trust, the bank calls attention to the following from 7 C. J., Banks and Banking 641, § 325:

> "Ordinarily where a deposit is made by one person in the name of another, such deposit belongs to the person in whose name the deposit is made; but nevertheless it has been held that a deposit may be made in the name of a person other than the depositor and yet remain the property of the depositor, so that the bank is justified in recognizing his ownership, where the circumstances are such that the deposit has not been put beyond his control."

■ In substance, the foregoing is repeated in 9 C. J. S., Banks and Banking, 597, § 287, and may be conceded to be a correct statement of the law. But, in the cases cited in support of the text, it is found that the claimant who made the deposit established by clear evidence that the fund belonged to him and not to the one in whose name the deposit was made. In each of them, whether the action was between two individuals, each claiming to be the owner, or by one of them against the bank in which the deposit was made, the fund was awarded by the court to that one shown by the evidence to be the true owner. See, *Greene v. Bank of Camas Prairie,* 7 Idaho 576, 64 P. 888; *Davis v. Lenawee Co. Sav. Bank,* 53 Mich. 163, 18 N. W. 629; *Reynolds v. St. Paul Trust Co.,* 51 Minn. 236, 53 N. W. 457; *Savings Bank of Baltimore v. McCarthy,* 89 Md. 194, 42 Atl. 929; *Weitzel v. Traders' National Bank,* 18 Pa. Super. 615. There is nothing in any of these decisions to countenance the view that in circumstances such as

are disclosed in the instant case a bank will be protected in paying over a deposit to one in whose name the credit does not stand and who, in fact, is not entitled to it.

The bank next invokes the rule that it is not deemed such a suspicious circumstance as to put a duty on the bank to investigate, for a trustee to carry trust credits in his personal bank account, as the bank is entitled to believe that the trustee will check the trust credits out of his account for proper trust purposes. See, *New Amsterdam Casualty Co. v. Robertson,* 129 Or. 663, 278 P. 963, 64 A. L. R. 1396; *Quanah, Acme, & P. R. Co. v. Wichita State Bank & T. Co.,* 127 Tex. 407, 93 S.W. (2d) 701, 106 A. L. R. 821; 4 Bogert, Trusts and Trustees, 2631; 2 Restatement, Trusts 966, § 324, comment d; and the following annotations: 106 A. L. R. 836, 64 A. L. R. 1404, 57 A. L. R. 925. It was held in *New Amsterdam Casualty Co. v. Robertson,* supra, that where the clerk of a school district transferred funds from his trust account to his personal account in the same bank, and thereafter checked out the money for his own purposes, the bank was not liable to the surety on the clerk's bond which had paid the loss. See *American Surety Co. v. Multnomah County,* 171 Or. 287, 138 P. (2d) 597, decided May 17, 1943. But this case presents an entirely different question. Actually, there was no trust fund but a legal credit to Joseph J. Connolly, who, as we have found, was the owner of the deposit. The only resemblance to the cases relied on by the bank lies in the fact that Thomas A. Connolly treated the deposit as a trust fund and that he did, eventually, with the bank's consent and cooperation, transfer this fund to his personal account and used the money for his own purposes. Before, however, we reach the ques-

tion involved in the New Amsterdam Casualty Co. case it must be determined whether the bank had legal authority to pay the money to Thomas after the death of Joseph.

 The bank had every reason to believe that it was Joseph's money. The legal effect of the transaction of the deposit is that *prima facie* it established the relation of creditor and debtor between Joseph and the bank. 5 Michie, Banks and Banking, 168, §79; *Matthews v. Hanson,* 145 Va. 614, 618, 134 S. E. 568; *Brown v. Daugherty,* 120 Fed. 526. The bank's conduct in sending duplicate deposit slips, advices of charge, and monthly statements to Joseph, and in subsequently issuing a time certificate of deposit to his estate, constituted, as was said in the case last cited "an admission and recognition by the bank that he was the depositor in fact and in law". With the possible exception of the testimony of Mr. Hoech, which we cannot accept, there is no evidence whatever, as there was in so many of the cases which have been called to our attention by counsel for the defendants, that at the time the deposit was made Thomas had an understanding with the bank that he was merely using Joseph's name for some purpose of his own.

The case is far different, for example, from *Davis v. Lenawee Co. Savings Bank,* supra. There the plaintiff, who had an account with the bank in his own name but for money belonging to his mother, desired to open an account on his own behalf. He was informed that he could not have two accounts in his own name, and it was suggested to him that the account be opened and kept in the name of his wife, and this was done. After his wife died the bank—with much greater prudence than was exhibited in this case—refused to pay him the

money. He sued and recovered, the court saying that his wife's name "was only another form for his name, and so agreed". The evidence here does not, in our opinion, justify any such conclusion as that.

It is true that Thomas assumed to exercise control of the fund, but, as we have seen, it was the sort of control ordinarily exercised by a trustee and not by one entitled to the beneficial ownership.

 Since the fund belonged to Joseph, the only justification the bank would have had for paying it to Thomas was that Thomas was authorized to receive it. *McMahon v. German-American Nat. Bank of Little Falls,* 111 Minn. 313, 127 N. W. 7, 29 L. R. A. (N. S.) 67. Such an agency might possibly have been inferred and relied on by the bank during Joseph's lifetime, for he made no objection to Thomas' dealings with the account, of all of which he was advised. But on Joseph's death the agency, if any there was, came to an end: *Gellert v. Bank of California, N. A.,* 107 Or. 162, 214 P. 377; 2 Am. Jur., Agency, 52, § 59; 1 Meacham, The Law of Agency (2d Ed.) 462, § 652; and the personal representative of Joseph J. Connolly would be the only one authorized to receive the fund. In *Brown v. Daugherty,* supra, the court said: "A more unbusinesslike course, on the part of a bank, to accept checks on a fund known not to have been signed by the depositor, and not even by Joseph Brown (the husband who made the deposit) as her agent, is hard to conceive." The checks in that case were honored by the bank while the depositor was living. In this case the depositor was dead and the bank had made out a time certificate of deposit to his estate. The "more unbusinesslike course" which the court found it hard to conceive in *Brown v. Daugherty* was here actually followed. In that case and *McMahon*

*v. German-American National Bank of Little Falls,* supra, and *Bates v. First National Bank,* 89 N. Y. 286, liability was imposed upon the defendant banks for unauthorized payments to persons making deposits in the name of others. The attendant circumstances were not identical with those present in the instant case; indeed, this case on its facts is, so far as our observation goes, *sui generis;* but the principles of law announced in the cited cases are applicable here.

■ To sum up the matter, this is not merely a case where a bank knowingly accepts a deposit of trust funds in the individual account of the trustee, but it is a case where a bank pays over funds theretofore standing to the account of a deceased depositor, and later carried in a time certificate of deposit to the credit of his estate, to one who is not authorized to receive them and in whom the bank had no warrant or justification for assuming that such authority reposed. In those circumstances, the only defense open to the bank would be that the money actually belonged to the person to whom it was paid. It acted at its peril, and, since it acted without authority of law and in violation of its depositors' rights, it must be held to have participated in the wrongful conversion of the fund. See *United States Fidelity Co. v. United States National Bank,* 80 Or. 361, 368, 157 P. 155, L. R. A. 1916E, 610.

■ ■ As previously stated, the statute of limitations was pleaded by the bank as well as by the other defendants. Aside from the contention of some of the defendants based on the statute of non-claim, which will be discussed later, all that is said in their briefs on the subject is that the claim of the plaintiff would be subject to the six-year statute of limitations when asserted against a living person, citing §§ 1-204 and 8-912, O. C.

L. A. There are a number of reasons why in this suit in equity, arising out of the conversion of moneys successfully concealed, the plea of the statute of limitations is not available to any of the defendants. As far as the bank is concerned it is enough to mention but one, namely, that, if a deposit is general and not evidenced by any regular certificate of deposit or other writing fixing the time of payment, the statute of limitations does not commence to run in favor of the bank until demand and refusal, unless such demand be deemed waived or otherwise dispensed with. 5 Michie, Banks and Banking 679, § 354; *Blakeley v. First National Bank,* 151 Or. 655, 51 P. (2d) 1034; *Haines v. First National Bank of Roseburg,* 89 Or. 42, 172 P. 505; *Missouri Pacific Ry. Co. v. Continental National Bank,* 212 Mo. 505, 111 S. W. 574, 17 L. R. A. (N. S.) 994. It cannot be that the unauthorized act of the bank in transferring the credit from a general deposit account into a time certificate of deposit after Joseph's death would in any wise alter the application of this rule.

The proof shows that in January, 1937, the bank commenced voluntary liquidation and the defendant J. W. Hoech has ever since then been in charge of its affairs as liquidating agent for the state superintendent of banks. It is alleged in the answer filed by the bank and Hoech that a notice was published in The Dalles Chronicle in February and March of 1937, notifying depositors and other creditors to present their claims against the bank for payment, and that no claim has ever been presented on behalf of Joseph J. Connolly or his estate, and that this claim therefore is barred. The plaintiff, in its reply, admitted that the bank is in liquidation, but denied the remaining allegations respecting publication of a notice to credi-

tors and the failure to present a claim. There is no proof on the subject and it is not mentioned in the briefs of counsel.

■ In view of the course which the bank has thus elected to pursue, we have deemed it proper, in order to avoid circuity of action, to determine the question of the bank's liability. That liability, however, cannot be enforced in this proceeding, in view of the exclusive remedies provided by § 40-1809, O. C. L. A., for persons having claims against insolvent banks. *Harrisburg National Bank v. Skinner*, 157 Or. 569, 575, 73 P. (2d) 363. Under that decision (157 Or. 583) the plaintiff, as representing a depositor, may still present its duly verified claim to the liquidator in the event that the circuit court has not made an order barring all claims, and may share in the distribution of whatever assets of the insolvent bank may remain, as provided in § 40-1809.

3. *Is plaintiff entitled to a lien on specific property?*

At the time of the conversion Thomas and Patrick were partners and Anthony was manager of the business. There was no bank account in the name of the partnership, but partnership funds were deposited in an account styled "A. J. Connolly" on which Anthony was privileged to draw for the payment of partnership expenses. Anthony's personal account was styled "A. J. Connolly Special". One would have thought that it would have been the other way around, but that is not the way the Connolly brothers transacted their business. For convenience, the "A. J. Connolly" account will be referred to as the partnership account.

On the day before the proceeds of the certificate of deposit payable to Joseph Connolly were credited

to Thomas' account, as hereinabove related, his balance was $1,906.82. On September 10, 1930, after making the deposit of $12,655.26 (which included the proceeds of the certificate of deposit) his balance was $14,464.23. On September 11 he withdrew $1,000 and deposited it in the partnership account. On September 13 he deposited in his own account $5,000, the source of which is not explained. On September 20 he withdrew $8,000 from his own account and deposited it in the partnership account, and on September 22 he withdrew $7,000 from his own account and likewise deposited it in the partnership account. In addition to the foregoing Thomas made other withdrawals between September 11 and September 20 totaling $2,138.18. There is no explanation of these items. On September 22, after the withdrawal of $7,000 which he deposited in the partnership account, Thomas' balance was $1,336.05, and there is nothing to indicate what became of that money.

Respecting the deposits of $1,000, $8,000 and $7,000 in the partnership account, Anthony testified that he had previously bought 3,200 lambs for the partnership and advanced the purchase price out of his own funds, and that he used the moneys so deposited to reimburse himself.

As will be presently shown in more detail, Anthony, on Thomas' death, was appointed administrator of the latter's estate and eventually acquired all the assets of the partnership. Among these assets, it is claimed, were the 3,200 head of lambs which Anthony bought for the partnership. It is asserted that a part of the purchase price was paid with trust funds belonging to Joseph Connolly, that the lambs with their increase are still in existence and in Anthony's pos-

session, and that the plaintiff is entitled to have a lien impressed upon them to the extent of its claim. In our opinion, the evidence will not support such a decree.

■ In the first place, there is no way of determining that all the converted moneys went into the partnership account. During the period in question the total amount of money in the bank to Thomas' credit—his balance on September 9 plus the deposits — was $19,562.08. His withdrawals for undisclosed purposes, added to his balance on September 22 after the last transfer of moneys to the partnership account, came to $3,464.23. No presumption can be indulged that in making these withdrawals Thomas was using his own money rather than Joseph's, nor that the balance of September 22 was his own money rather than Joseph's. All that can be said with certainty is that the sum of $2,999.35, which is the difference between $6,463.58, the amount of the converted money, and $3,464.23, is the portion of the converted money which was transferred to the partnership account and used in the purchase of sheep. But even as to this sum, the proof is that the increase of the 3,200 lambs were sold, and the evidence is indefinite as to whether any, or if so, how many of the original band remain. This the plaintiff practically concedes in its brief. The proceeds of the sales, it is true, were received by the partnership, but they were used in the payment of debts, or the expenses of business, and hence the effort to establish a lien for trust funds must fail. *Shute v. Hinman,* 34 Or. 578, 56 P. 412, 58 P. 882, 47 L. R. A. 265; *Ferchen v. Arndt,* 26 Or. 121, 37 P. 161, 46 Am. St. Rep. 603, 29 L. R. A. 664; *Sharpe v. Hartman,* 26 Or. 131, 40 P. 230; *Muhlenberg v. Northwest Loan and Trust Company,* 26 Or. 132, 38 P. 932, 29 L. R. A. 667.

4. *Question of liability as to defendants Anthony J. Connolly, Ann Connolly and Kathleen Connolly.*

Before considering the other matters which we deem important as bearing on the asserted liability of the above named defendants, we state our conclusion, based upon a painstaking examination of the record, that the charges of fraud, freely made in the complaint, are without foundation either as respects the conduct of these defendants or of any of the others, with the exception of Eastern Oregon Banking Company, which was, as we have seen, in a technical sense a party to the breach of trust. There is no credible evidence that any of the defendants, except the bank, knew, or had ever heard of, the fund in controversy, or knew that the estate of Joseph J. Connolly had a claim against the estate of Thomas A. Connolly until after final settlement of the latter estate and shortly before the commencement of this suit. That there were irregularities in some of the methods pursued in the administration of the estate of Thomas A. Connolly may be conceded, but the alleged motive for fraud, namely, to cheat the estate of Joseph J. Connolly, was entirely lacking.

Upon the death of Thomas A. Connolly on July 1, 1935, Kathleen, the widow and sole heir at law of Thomas, and Patrick, the surviving partner, waived their rights to act as administrator of the estate in favor of Anthony, recognizing that by reason of his experience as manager of the partnership business he was the one best qualified for that office. Accordingly, letters of administration were granted to Anthony by the County Court of Wasco County. There was need of competent handling of the affairs of the estate, for the claims and taxes came to more than

$120,000 and the total cash, both of the individual and partnership estates, amounted to less than $9,000. The estate was not insolvent, in the sense that the indebtedness exceeded the appraised value of the assets, but it is not improbable that, had administration taken the normal course, the creditors would not have been paid in full and there would have been nothing for the heir and the surviving partner. The operations of the partnership had been financed by the defendants Mid-Columbia Production Credit Association, which had a claim against the estate at the time of Thomas' death in the amount of $42,962.42, secured by a mortgage on the livestock and farm equipment of the partnership. The Credit Association was threatening to foreclose its mortgage, but suggested to Anthony as a possible solution of the problem that if he would purchase the interests of Kathleen and Patrick it would advance sufficient moneys to pay off the claims against the estate and would continue to finance the operation. This suggestion met with the approval of the interested parties, and on February 27, 1937, Kathleen and Patrick executed to Anthony J. Connolly and Ann Connolly, his wife, deeds and bills of sale conveying and transferring all their interest in the real and personal property of the partnership, and Kathleen also conveyed and transferred all her interest in the individual estate of Thomas A. Connolly, deceased. As consideration, Anthony and Ann Connolly gave Kathleen their promissory note for $8,000, which, before it fell due, she cancelled on the payment of $5,000 in cash; gave Patrick their promissory note by which they undertook to pay him $200 a month for the balance of his life; and assumed and agreed to pay the claims and liabilities proved and allowed in the administration of the estate.

Anthony satisfied his own claim amounting to $36,278.11, and, with funds advanced by the Credit Association, paid all the other claims of creditors, with the exception of the claim of John Connolly, which were presented and allowed, and also paid taxes in the sum of $8,220.59. The John Connolly claim, which was compromised for $15,360, was settled by the payment of $7,360 cash obtained from the Credit Association, and the giving of a promissory note by Anthony and Ann to John for the balance.

At this time the mortgage indebtedness to the Credit Association amounted to $23,028.58, and, to secure this balance, as well as the sums advanced by the Credit Association to pay off the claims against the estate, Anthony and his wife executed a new mortgage for $78,683, which covered the personal property which they had purchased from Kathleen and Patrick. As additional security they also gave a mortgage on property theretofore owned by Anthony, consisting of a 6,000 acre ranch, 1400 head of sheep, and some leases. On October 30, 1937, the date of the order closing the estate, the amount owing to the Credit Association was $59,246.45.

There is nothing, in our opinion, to suggest that this transaction was not conceived and carried out in entire good faith by all the parties to it, or that the consideration paid to the widow of Thomas A. Connolly was not fair and adequate. Through this means the heir and surviving partner were enabled to receive substantial sums when otherwise they would probably have gotten nothing from the estate; all the known creditors were paid; and Anthony was placed in a position, though not without considerable risk to himself, where he might carry on the business with

a free hand, unembarrassed by pressure from creditors, and, in the course of time, perhaps, liquidate the indebtedness.

But the sale of her interest by the heir is attacked by the plaintiff as in violation of § 19-824, O. C. L. A., which provides in part as follows:

> "All purchases of the property of the estate by an executor or administrator, however made, whether directly or indirectly, are prohibited, and if made are void."

■■ This contention is without merit because the statute, as this court has held, is only intended to inhibit the purchase of the property of the estate by an administrator at his own sale, and does not apply to a purchase of the interest of an heir or legatee. *Lombard v. Carter,* 36 Or. 266, 59 P. 473. It is asserted in plaintiff's brief that what was said in *Lombard v. Carter* on this subject "was more or less dicta". There is not even the semblance of justification for this statement. The suit was brought by a judgment creditor to set aside an assignment by a legatee of his legacy and all his other interest in the estate to the administrator's wife. As stated in the opinion, the only contention on the appeal was that the assignment was void under § 1166, Hill's Annotated Code, which is now § 19-824, O. C. L. A., the statute relied on by the plaintiff. The court assumed, without deciding, that the plaintiff stood in the shoes of the legatee, and the entire matter actually decided, in a brief opinion, is contained in the following language:

> "Conceding, but not deciding, that such is the case, the plaintiff cannot prevail under the facts. It is the purchase of the property of the estate by an administrator at his own sale which is inhibited

by the statute, while the case assumed would be rather that of a trustee purchasing trust property from his *cestui que trust:* Mills v. Mills, 57 Fed. 873, and 63 Fed. 511. In such a case, if the transaction appears to be fair, and grounded upon an adequate consideration, it will be upheld; and it is obviously so in the present controversy, or, at least, there is nothing in the record to show to the contrary.''

The rule of *Lombard v. Carter* is recognized in *Wells v. Wood,* 125 Or. 38, 47, 263 P. 54, where, at the suit of beneficiaries under a will who had assigned their legacies to the executrix, the sale was set aside, not on the ground that it was void under the statute, but because the contract was not fair and the executrix had taken advantage of her position as such; and it is in accord with the weight of authority. 3 Woerner, The American Law of Administration (3d Ed.) 1695, § 487; 21 Am. Jur., Executors and Administrators, 736, § 632.

We therefore conclude that the sale of her interest in the estate by the heir, Kathleen Connolly, to the administrator was not void under the statute.

██ The estate was closed on October 30, 1937. Prior thereto, on July 17, 1937, Anthony, as administrator, obtained an order from the probate court authorizing him to sell certain items of personal property, and a similar order relative to other items of personal property on October 30, 1937. The property embraced by these orders consisted of certain shares of stock, two promissory notes, a claim against the First National Bank of The Dalles, Oregon, four automobiles, an interest in a contract of purchase of real estate, and two claims for damages for killing and injuring sheep. The evidence shows that pursuant to these orders a

purported sale of these items of property was made by Anthony, as administrator, to his wife, Ann, for a consideration of $25.

This sale is also challenged, and it is undoubtedly void. The only purpose sought to be accomplished by it, as testified to by Miss Celia Gavin, attorney for the administrator, was to have of record a title to such items of property as shares of stock, promissory notes, etc., which would facilitate dealing with them by transfer or otherwise. Miss Gavin explained that the county judge was fully advised by her that the administrator and his wife had acquired all the assets of the estate, and was informed of the purpose to be served by the sale in question, and there is no reason to doubt her testimony. The sale thus ordered by the county court was ineffectual for any purpose. It was a mere form, and actually left the title to this personal property where it had been ever since Anthony and Ann bought out the heir and surviving partner. We dare say that the procedure adopted is not to be commended and that the records in the probate court of the administration of an estate should truly reflect what is actually done, but there was nothing wrongful or fraudulent in the transactions, nor any improper motives. Going through the form of a void sale in order to accomplish a legitimate object cannot be held to impair the validity of the title which Anthony and Ann had already received by their purchase of the assets from Kathleen and Patrick.

Other acts of the administrator characterized as "fraudulent conduct" are dwelt upon in the plaintiff's briefs. We will not consume time and space and further extend a necessarily long opinion by referring to them specifically. Nothing except the conviction of

counsel, sincerely held no doubt, that Anthony was plotting to defeat Joseph's estate of its claim could have translated the acts criticized into terms of fraud. As we do not share that conviction, neither do we think that the charges are sustained. It will be well, however, to call attention to the fact that, acting under the order of the court, the administrator carried on the business of the partnership and that his first report, filed October 14, 1936, shows receipts of $146,811.49 and disbursements of $137,564.65. This will serve to illustrate the magnitude of the enterprise in which he was engaged. Out of the hundreds of items in this and the other reports the plaintiff has discovered two which it is claimed are erroneous. Whether they are or not, they fall far short of being evidence of fraud. There is no contention that the property inventoried did not comprise all the assets of the estate, or that it was not honestly appraised, or that the claims were not honestly reported to the court, or that any creditor who presented his claim was not paid.

From what has been said so far it follows that, notwithstanding the irregularities to which attention has been called, the estate of Thomas A. Connolly, deceased, was fully and finally administered, and there is no ground for vacating the decree of final settlement. Neither is the plaintiff entitled to relief against Anthony in his administrative capacity. *Newberry v. Wilkinson,* 199 Fed. 673, 681. As stated in that case, "the order and judgment of the probate court in settling the estate and discharging the administratrix are conclusive and binding upon this court." And, since there is no way under the evidence of identifying specific property into which the converted fund can be traced, the plaintiff "could have no other demand,

except a personal claim against the estate, occupying the position of a general creditor, for so much money as might have been found due on a proper showing or account". *Newberry v. Wilkinson,* supra; *Ferchen v. Arndt,* supra.

It becomes necessary, therefore, to determine whether a remedy is now available to the plaintiff against the heir or those who acquired from her and now own the assets of the estate, and we are met at the threshold of that inquiry by the objection that the claim, not having been presented to the administrator before final settlement, is barred by the statute of non-claim as well as by the general statute of limitations.

The statutes fixing the time for presenting claims to the executor or administrator of a decedent's estate are as follows:

"Every executor or administrator shall, immediately after his appointment, publish a notice thereof, in some newspaper published in the county, if there be one, or otherwise in such paper as may be designated by the court or judge thereof, as often as once a week, for four successive weeks, and oftener if the court or judge shall so direct. Such notice shall require all persons having claims against the estate to present them, with the proper vouchers, within six months from the date of such notice, to the executor or the administrator, at a place within the county therein specified." § 19-701, O. C. L. A.

"Before the expiration of the six months mentioned in the last section, a copy of the notice as published, with the proper proof of publication shall be filed with the clerk. A claim not presented within six months after the first publication of the notice is not barred, but it cannot be paid until the claims presented within that period have been satisfied; and if the claim be not then due, or if it be

contingent, it shall nevertheless be presented as any other claim. Until the administration has been completed, a claim against the estate not barred by the statute of limitations may be presented, allowed, and paid out of any assets then in the hands of the executor or administrator not otherwise appropriated or liable.'' § 19-702, O. C. L. A.

█ Generally, all claims which are not presented prior to the entry of final discharge are barred from payment out of the estate funds. *Livesley & Roberts v. Pioneer Trust Company,* 170 Or. 613, 135 P. (2d) 777, and cases there cited. The question here, however, is whether the fact that the plaintiff's claim arises out of the conversion of trust funds which was concealed from the claimant, affords a ground upon which equity will interfere to prevent the bar of the statute from being raised to defeat the claim of the *cestui que trust* upon discovery of the fraud.

█ The decisions are conflicting upon this question, some courts holding that the statutes of non-claim are to be strictly enforced, leaving no room for exceptions in favor of claims of this character, while, on the other hand, there is considerable support for the view that fraud of a fiduciary in concealing his misuse of trust funds constitutes a basis for equitable interposition. 21 Am. Jur., Executors and Administrators, 581, § 354. Many of the cases will be found digested in the annotation to *Davis v. Shepard,* 135 Wash. 124, 237 P. 21, 41 A. L. R. 163, 169. In that case the court refused to relax the strict terms of the statute. But we are in accord with the opinion expressed by the annotator (41 A. L. R. 170) that: ''Better reasoning, if not weight of authority, supports the views expressed in the dissenting opinion of Holcomb, J., in the reported case (*Davis v. Shepard*), that ordinarily principles of equity require

that an exception be made to the statute in respect to claims arising from fraudulent misappropriation or misuse of trust funds where the claimant is not chargeable with laches in failing to discover the fraud in time to have presented his claim within the period allowed by statute.'' With us, a persuasive and weighty authority is the opinion of United States District Judge Wolverton, a former member of this court, speaking for the Circuit Court of Appeals for the Ninth Circuit in *Newberry v. Wilkinson,* supra. The question was as to the applicability of the statutes of non-claim and of limitations of the state of Washington to a claim similar in origin and circumstances to that which we are considering, and it was held, in a carefully prepared opinion supported by numerous decisions, that a court of equity was empowered to interfere to remove the bar of both, saying that in such a case equity acts ''without regard to the letter or analogy of the statutes of limitation.''

Here the plaintiff cannot be charged with laches. The suit was commenced within a few months after the discovery of the misappropriation of the fund, and the failure sooner to discover it was due to the concealment practiced by Thomas A. Connolly and the other members of the family.

As far as the statute of limitations is concerned, the suit is governed by § 1-206 relating to actions based upon fraud, and would not be barred even at law.

We hold, therefore, that neither the statute of non-claim nor the statute of limitations is a bar to this suit.

We come, therefore, to consider certain provisions of Ch. 7, Title IX, O. C. L. A., covering the subject of suits against the next of kin, legatees, heirs or devisees of deceased persons. By these sections the next of kin

of a deceased person are liable to a suit in equity by a creditor of the estate to recover the distributive shares received out of such estate, or so much thereof as may be necessary to satisfy his debt: § 9-702. Legatees are liable to a suit in equity by a creditor of the testator to recover the value of any legacy received by them, provided it be shown that no assets were delivered by the executor or administrator of the testator to his next of kin, or the value of such assets has been recovered by some other creditor, or such assets are not sufficient to satisfy the demands of the plaintiff: § 9-705. Heirs and devisees are liable to a suit by a creditor of a deceased person to recover the debt of their ancestor or testator to the extent of the value of any real property inherited by or devised to them: § 9-708; "but the heirs are not liable for the debt, unless it appear that the personal assets of the deceased were insufficient to discharge it": § 9-709.

Section 9-712 reads:

"A decree against an heir or devisee, on account of the debt of his ancestor or testator, may be enforced by execution against the real property shown to have descended to the heir or devisee, and not otherwise. Such decree shall have preference as a lien on such real property to any judgment or decree obtained against such heir or devisee on account of a debt or demand due in his own right."

Section 9-713 reads:

"When it appears in the suit, that before the commencement thereof the heir or devisee has aliened the real property descended to him, or any part thereof, he shall be personally liable for the value of the property so aliened, and a decree may be given against him therefor, to be enforced by execution, as if the decree were for his own debt. No

real property aliened in good faith and for a valuable consideration by an heir or devisee before suit commenced against him is liable to an execution for the debt of his ancestor or testator, or in any manner affected by a decree therefor against such heir or devisee.''

■ Although these provisions were enacted in 1862, the year of the adoption of the probate code with its statute of non-claim, this court apparently has never had occasion to determine the circumstances which justify resort to the remedy which they grant, though obviously they were intended to supplement the provisions of the probate code for the collection of claims against the estates of decedents.

In the only cases in which they have been invoked these sections have been held inapplicable, either because there was an adequate remedy at law not availed of (*Grange Union v. Burkhart,* 8 Or. 51; *Schlussel v. Hays,* 89 Or. 463, 174 P. 722), or some condition precedent of the statute had not been met (*Rainey v. Rudd,* 82 Or. 461, 160 P. 1168; *Schlussel v. Hays,* supra), or, where it was attempted to hold the legatee of a deceased partner, and the remedy was denied because it was not shown that other assets of the partnership were insufficient to satisfy the plaintiff's demands (*Root v. Vawter,* 108 Or. 190, 215 P. 982).

Since the indebtedness of the estate greatly exceeds the value of the personal assets, which must be applied first to the payment of debts, the only question of liability that could arise here is with respect to the lands inherited by the heir.

■ At common law the heir was liable only for the debts by specialty of his ancestor; he was bound to satisfy them to the extent of the value of the land

descended to him. But if he had aliened the land before action or proceeding against him for the ancestor's debt the creditor had no remedy. 3 Woerner, the American Law of Administration, 1968, § 574. To remove this injustice, Oregon, as well as most of the states of the Union, enacted a statute providing that such property should descend to the heir subject to the debts of the decedent. *Stadelman v. Miner*, 83 Or. 348, 155 P. 708, 163 P. 585, 163 P. 983. As stated by Mr. Woerner, *ibid.*, 1970, § 575, "in America, by statutes in all of the states, realty has been subjected to the payment of the decedent's debts by proceedings in the probate courts, as well as by direct action in most states against the heirs or devisees." But since, under the American system of administration, all testamentary matters, including the payment of decedent's debts and legacies, are placed under the control of the probate courts, "courts of equity refuse to aid creditors who fail to collect their claims, in the mode thus pointed out by law, before final settlement and discharge of the administrator, without satisfactory excuse." *Ibid.*, 1971, § 575. See, 16 Am. Jur., Descent and Distribution, 908, § 126.

█ . Generally, it is held that a creditor whose claim is duly proved but never satisfied, or whose claim has come into existence too late to be proved, or after the administration has been closed, may avail himself of the remedy in equity directly against the heir. *Baker v. Baker*, 220 Iowa 1216, 264 N.W. 116, 103 A.L.R. 995; *Hall v. Martin*, 46 N. H. 337; *St. Mary's Church v. Wallace*, 10 N. J. L. 311; *Hall v. Brewer*, 40 Ark. 433; *Payson v. Hadduck*, 8 Biss. 293; *Williams v. Ewing*, 31 Ark. 229; *Chitty v. Gillett*, 46 Okla. 724, 148 P. 1048, L. R. A. 1916A, 1181. We are of the opinion, however, that the remedy is not limited to cases of

that character, but extends to a case like this in which, as we have held, the circumstances warrant the interposition of a court of equity. So much, indeed, was held, without the aid of statute, in *Newberry v. Wilkinson,* supra, though in that case relief was denied because of the plaintiff's laches.

■ The common law rule that if the heir had aliened the land before action or proceeding against him for the ancestor's debt the creditor had no remedy has been abolished in most of the states, and it is now generally provided by statute that where the heir or devisee has aliened his share of the property descended or devised, he becomes personally liable to the ancestor's creditor to the amount of its value: Woerner, *ibid.,* 1968, § 574, 1984, § 579. Our statute, § 9-713, renders immune from execution "real property aliened in good faith and for a valuable consideration by an heir or devisee before suit commenced against him", while leaving the heir or devisee liable for the value of the property so aliened. It follows, therefore, that if Anthony and Ann Connolly are to be regarded as *bona fide* purchasers of the assets of the estate of Thomas A. Connolly, deceased, the lands they purchased are freed of the lien of the present claim, but Kathleen Connolly is liable to the plaintiff to the extent of the value of the real property inherited by her.

■ The question whether the sale was *bona fide* has been discussed in argument by counsel for the plaintiff largely upon the assumption that Anthony and Ann had actual knowledge of the plaintiff's claim. We have held that they did not. It still remains to be determined, however, whether they had constructive knowledge in view of the fact that they purchased the assets while the estate was still being administered.

Mr. Woerner says: "A sale of land by the heir or devisee before the expiration of the time limited for the presentation of claims against the deceased, is necessarily invalid to deprive a creditor of his remedy against the same." *Ibid.*, 1983, § 579. To the same effect see, 16 Am. Jur., Descent and Distribution, 908, § 126; *Ogooshevitz v. Arnold,* 197 Mich. 203, 211, 163 N. W. 946, 165 N. W. 633; *Flood v. Strong,* 108 Mich. 561, 66 N. W. 473; *Armstrong v. Loomis,* 97 Mich. 577, 56 N. W. 938; *Globe Mercantile Co. v. Perkeypile,* 189 Ind. 31, 125 N. E. 29; *Moore v. Moore,* 155 Ind. 261, 263, 57 N. E. 242. In the last two cases cited it is stated that the purchaser in those circumstances is "bound to know that until the estate is finally settled the sale of the real estate may become necessary for the payment of debts."

The question here, of course, is whether the purchaser is bound to take notice of a claim that is not proved in the probate of the estate and is not asserted or known of until after final settlement. As to this it is said in 16 Am. Jur., Descent and Distribution, 909, § 126:

> "In certain circumstances where there have been administration proceedings in which the claim has not been filed, the view is taken that the property of the decedent may in equity be subjected to sale for the payment of his debts. This is true as to claims accruing after the time allowed for the probate of claims has expired. Where property is thus liable to the payment of a claim not filed in the administration proceedings, or of a claim not paid for some other reason, the right to hold that property for the payment of the claim may be cut off by conveyance thereof to a bona fide purchaser for value before the commencement of a suit to charge the land with the payment of the indebtedness. Such claims are not cut off where

the conveyance is not for a valuable consideration; the claimant may follow the property into the hands of the purchaser.''

In accordance with the foregoing statement of the rule, the rights in real property of a purchaser for value without notice from the heir were held superior to those of a creditor whose claim did not accrue until after the estate had been settled in *Berton v. Anderson,* 56 Ark. 470, 20 S. W. 250, and *Scoggin v. Hudgins,* 78 Ark. 531, 94 S. W. 684, 115 Am. St. Rep. 60; while in *Baker v. Baker,* supra, where the conveyance was voluntary, the land in the hands of the alienee was held subject to the lien of a creditor's claim arising in a similar manner. It does not appear in any of these cases whether the conveyance was made before the final settlement of the estate or afterwards. In *Berton v. Anderson,* supra, the court said:

"Our administration laws seek to promote the early settlement of estates. Walker v. Byers, 14 Ark. 253. And it does not comport with the policy of those laws to impose a restraint upon the heir's power to alien the land he inherits after it is free of all claims allowable in the probate court. Mays v. Rogers, 37 Ark. 155. The claims allowed there constitute a lien upon the land which relates back to the time of the decedent's death, and of which all persons are bound to take notice. And although this lien will be lost by the failure to enforce it within a reasonable time, it cannot be defeated by the heir's conveyance, executed either before or after the grant of administration. But there is no lien of a statutory nature in favor of a claim accruing too late to be authenticated against the executor or administrator. And a claim thus arising is sustained as a charge upon the estate in the hands of the heir, solely on the ground that it is an equity in the property of the ancestor superior

to that of the heir. Walker v. Byers, 14 Ark. 253. But the equity of such a claim is not superior to that of a *bona fide* purchaser acquiring title before the commencement of a suit to enforce the creditor's demand. The equity of the purchaser in such case is at least equal to that of the creditor, and the claim of the latter cannot therefore prevail against it. 1 Perry on Trusts, sec. 218; Bispham's Eq., secs. 40, 175." 56 Ark. 475.

It seems entirely clear that (in the absence of exceptional circumstances) after administration has been completed a purchaser of real property from the heir for a valuable consideration may safely rely upon the decree of final settlement, and, if he is without knowledge of an outstanding claim, the land so purchased is not subject to the payment of such claim. And it has been held, in a well-considered decision, that one who purchases for a valuable consideration during the course of administration will, after the decree of final settlement, be protected in his title as against claims which may subsequently arise, but of which he has no actual knowledge. *Van Bibber v. Reese,* 71 Md. 608, 18 Atl. 892, 6 L. R. A. 332. But we are met here with the question whether an administrator so purchasing is entitled to the benefit of that rule. An administrator is a trustee both for the creditors and the beneficiaries of the estate. It is his duty towards creditors to see to it that they are paid, insofar as the assets of the estate will permit. It is his duty towards the heir, in dealing with the subject matter of his trust, to exercise the utmost good faith and to take no advantage, even the slightest, of his position. "Courts of equity are chiefly concerned in supervising the relations between a trustee and the *cestui que trust* to prevent the trustee from serving his

own interest at the sacrifice of the interest of his *cestui que trust.*'' *Wells v. Wood,* supra. The defendant Ann Connolly stands in no different position than her husband, the administrator. *Acton v. Lamberson,* 102 Or. 472, 490, 202 P. 421, 202 P. 732. To hold their rights superior to those of the plaintiff would be to subordinate the claim of the *cestui* to that of the trustee. The creditor's lien would be lost, and he would be relegated to the dubious remedy of a personal judgment against the heir.

There is presented, also, the question of equities as between the administrator and the heir.

◼ Kathleen Connolly's purpose in selling her interest was to free herself entirely from the estate and its indebtedness. She so testified in substance, and Anthony undoubtedly was aware of that purpose and dealt with her on that basis. Having done so, it would be inequitable for him to insist that as between himself and the heir, whose interest he was bound to protect, she must bear the burden of this claim while he escapes. Yet that would be the result if his contention that he was a *bona fide* purchaser were to be sustained. Stated more concretely, Kathleen Connolly would, in that event, have actually received nothing for her interest, and Anthony, having, together with his wife, acquired the whole estate, would still be in the position of attempting to maintain that he dealt fairly with her. Both these things could not be true at the same time. We are convinced that he did intend to deal fairly with her and that a court of equity should aid him in the complete fulfillment of that intention by declaring that he purchased her interest, burdened with all the indebtedness of Thomas A. Connolly, whenever or however it might

be established. Only so, in our opinion, could justice and equity be accomplished in this case.

As we construe the statute making the heir liable in equity for the debts of his ancestor, the decree can be enforced only by execution against the real property shown to be descended to the heir, unless it has been *bona fide* aliened. In the latter event, the heir is made personally liable for the value of the property so aliened, but if the conveyance is not *bona fide* the real property remains subject to the indebtedness in the hands of the alienee as fully as though it had not been aliened; and it is only in case of a *bona fide* alienation, which prevents the creditor from following the property, that the heir is held to be personally liable to the extent of its value.

In the present case, for the reasons given, we are of the opinion that Anthony J. Connolly took the real property which he purchased from Kathleen subject to the lien of the plaintiff's claim.

5. *Rights of defendant Mid-Columbia Production Credit Association.*

As has been stated, it is the plaintiff's contention that the mortgages given to the Credit Association by Anthony and Ann Connolly are subordinate to the plaintiff's lien. In the view we have taken of the case, that question need be considered only with reference to the mortgage covering real property in Wasco county executed on November 23, 1938, for we have held that the plaintiff's lien is limited to the real property, and all the other mortgages taken by the Credit Association were secured by personal property. The real property mortgage was given to secure the sum of $125,114, and was executed at the same time as a chattel mortgage

upon the livestock, etc., for the same amount, and was taken, according to the testimony of the witness Hoech, secretary and treasurer of the Association, because it was considered that the security of the chattel mortgage alone was inadequate.

The Credit Association for a number of years had financed the operation of the Connolly sheep business and had held a mortgage on the livestock and farming equipment. It was the practice to renew the mortgage at least once a year in an amount representing the balance owing at the time of renewal plus advances in accordance with the then requirements of the mortgagors. It was not usual, however, to take the security of a real property mortgage as well as a chattel mortgage. It appears that the chattel mortgage of November 23, 1938, was a renewal of a chattel mortgage dated December 10, 1937, that the indebtedness secured by the earlier mortgage was some $6,700 in excess of that secured by the later, while the number of sheep, cattle and horses, and the quantity of hay covered by the later mortgage was greater than in the earlier. It also appears that letters of administration of the estate of Joseph J. Connolly, deceased, were granted on August 23, 1938, and that about November 10, 1938, Mr. Bennett, one of the attorneys for the plaintiff, had interviewed Anthony J. Connolly for the purpose of ascertaining whether he had knowledge of the existence of any assets of that estate, and particularly of an indebtedness for wages owing by the estate of Thomas A. Connolly, deceased. From all this it is argued that the Credit Association took the real property mortgage of November 23, 1938, for the purpose of defrauding the plaintiff in the collection of its claim.

We are unable to make so tenuous a showing the foundation for a finding of fraud. Nothing in the evidence referred to serves to bring home to the Credit Association knowledge that the estate of Joseph J. Connolly, deceased, had or was asserting a claim. Anthony's knowledge on that subject was not the knowledge of the Credit Association, and, save for the taking of the additional security of a real property mortgage, the transaction was but a repetition of numerous similar transactions going back to a time years before the death of Thomas A. Connolly. The indebtedness had become very large, and it would require something beyond what is shown here to justify the conclusion that the mortgage in question was fictitious and was not demanded because the Credit Association officials had in good faith and as a matter of business prudence determined that additional security was desirable or necessary.

It is also urged that Mr. Hoech, as president of Eastern Oregon Banking Company, knew of the misappropriation of the fund in controversy, and that such knowledge is to be imputed to the Credit Association of which he afterwards became the secretary-treasurer. But there is no evidence that Hoech knew of the misappropriation. He knew of the deposit of funds in the bank by Thomas in Joseph's name. He was an officer of the bank at that time, and continued to be so until liquidation commenced in 1937. He became president in 1930. But his active management of the bank's affairs ceased in 1924 when he left Shaniko and moved to The Dalles. From that time forward, according to his testimony, he knew nothing concerning the Joseph J. Connolly account. There is no evidence to the contrary, and, therefore, no basis for the application of the legal principle invoked by the plaintiff.

█ We are of the opinion, nevertheless, that (subject to a possible exception to be hereinafter stated) the lien of the Credit Association's real property mortgage ought, in equity, to be held subordinate to that of the plaintiff's claim. The Credit Association's rights could rise no higher than Anthony's. Not only did the probate records give it constructive notice that Anthony, while administrator, purchased from the heir, but, through its agent, Mr. Hoech, it had actual knowledge of the transaction, aided in bringing it about, and was, in a sense, a party to it. It took its mortgage, therefore, charged with knowledge of all the legal consequences that might ensue from a sale made in such circumstances, and its equities must stand or fall with the equities of those with whom it dealt.

█ To the extent, however, if at all, that the indebtedness secured by the real property mortgage is for moneys advanced by the Credit Association for the payment of claims against the estate of Thomas A. Connolly, deceased, and used for that purpose, the Credit Association's lien upon real property is superior to that of the plaintiff. This is because the Credit Association is subrogated to the rights of the creditors whose claims it paid, and, since those claims were presented to the administrator and allowed, they are entitled to preference over that of the plaintiff. See, 11 R. C. L., Executors and Administrators, 376 § 449. *Acton v. Lamberson,* 102 Or. 472, 491, is not in conflict; subrogation was denied in that case because the sale was "steeped in fraud". In the enforcement of its lien for this portion of the indebtedness, however, the Credit Association must first resort to the personalty, in accordance with the rule that where two creditors seek satisfaction out of the assets of their debtor, and one

of them can resort to two funds, whereas another creditor has resort to only one of the funds, the former may be required to seek satisfaction out of the fund which the latter creditor cannot touch, in order that the latter may, if possible, have his claim satisfied out of the fund which is subject to the claims of both parties. *Carnes v. Manning,* 118 Or. 665, 683, 248 P. 137; *Hall v. Stevenson,* 19 Or. 153, 159, 23 P. 887, 20 Am. St. Rep. 803; 35 Am. Jur., Marshaling Assets and Securities, 385, § 2. Similarly, the plaintiff must first seek satisfaction of its claim out of the lands formerly a part of the estate of Thomas A. Connolly, deceased, in Sherman, Deschutes and Wheeler counties, which are not subject to the lien of the Credit Association's mortgage.

6. *Question of liability of defendant Patrick H. Connolly.*

The sole ground of liability asserted against Patrick H. Connolly is that the converted moneys were used for the purchase of sheep for the partnership of which Patrick was a member.

The applicable principle of law is thus stated in *Englar v. Offutt,* 70 Md. 78, 89, 16 Atl. 497, 14 Am. St. Rep. 332:

"For the principle of law is very clear, that if a partner, being a trustee or fiduciary, improperly employs the money of his *cestui que trust* in the partnership business, or in the payment of partnership debts, *this fact alone, and without anything more,* is not sufficient to entitle the *cestui que trust* to occupy the position of creditor and to enforce repayment of his money as against the firm. To render the firm liable in such case the firm itself must be shown to have been implicated in the breach of trust, and this cannot be unless all the partners either knew whence the money came, or knew that it did not belong to the partner making use of it."

To the same effect see *Goldthwaite v. Janney*, 102 Ala. 431, 15 So. 560, 28 L. R. A. 161, 48 Am. St. Rep. 56; *Hogan v. Reynolds*, 8 Ala. 59, 71; 47 C. J., Partnership, 886, § 365; 40 Am. Jur., Partnership, 263, § 192; Lindley on Partnership (9th Ed.) pp. 229-234.

There is nothing in the cases of *McIntyre v. Kavanaugh*, 242 U. S. 138, 61 L. Ed. 205, 37 S. Ct. 38; *Durant v. Rogers*, 87 Ill. 508; or *Strang v. Bradner*, 114 U. S. 555, 29 L. Ed. 248, 5 S. Ct. 1038, cited by the plaintiff, to the contrary. The basis for imposing liability in those cases was that partners are individually responsible for torts, by a firm, when acting within the general scope of its business, whether they personally participate or not. Thomas A. Connolly was not acting for the firm or within the scope of its business when he misappropriated Joseph's money, and Patrick had no knowledge of the source of the fund. He cannot, therefore, be held liable to the plaintiff.

 * * * * *

In accordance with the views hereinabove expressed, the decree of dismissal as to the defendants Anthony J. Connolly, Ann Connolly and Kathleen Connolly is reversed, and a decree will be entered against the defendant Kathleen Connolly for the amount of the moneys converted, to-wit: The sum of $6,463.58 with interest thereon at six per cent per annum from September 9, 1930; such decree, however, to be enforced only by execution against the real property of the estate of Thomas A. Connolly, deceased, the title to which is now vested in Anthony J. Connolly and Ann Connolly. Such decree shall have preference as a lien upon the real property in Wasco County over the lien of the real property mortgage executed by Anthony J. Connolly and Ann Connolly to Mid-Columbia Produc-

tion Credit Association under date of November 23, 1938, with this exception, however, that to the extent, if at all, that the indebtedness secured by such mortgage is for moneys advanced by the Credit Association to Anthony J. Connolly and Ann Connolly for the payment of claims against the estate of Thomas A. Connolly, deceased, and used for that purpose, the lien of the Credit Association shall have priority over the lien of this decree. The amount of such prior lien, if any, will be determined by the Circuit Court on remand of the cause; and in the enforcement thereof the Credit Association must first have resort to the security of its chattel mortgage of November 23, 1938. Before resorting to the Wasco County lands, the plaintiff shall seek satisfaction of its judgment out of the lands in Deschutes, Sherman and Wheeler counties formerly a part of the estate of Thomas A. Connolly, deceased.

The decree of dismissal as to the defendants Eastern Oregon Banking Company and J. W. Hoech, as its liquidating agent, is affirmed; but, inasmuch as the bank was a party to the breach of trust, it is liable to the plaintiff in the full amount of its claim with legal interest from the date of the conversion; and the decree, therefore, will be without prejudice to the plaintiff's right to present and secure the allowance of its claim in the liquidation proceedings, as above indicated.

The decree of dismissal as to the remaining defendants, namely, Anthony J. Connolly, as administrator of the estate of Thomas A. Connolly, deceased, and Patrick H. Connolly, is affirmed. None of the parties will recover costs or disbursements.

The cause is remanded to the Circuit Court for further proceedings and the entry of a decree conformable to this opinion.

The late Mr. Justice RAND did not participate in this decision.

KELLY, J., concurs in the result.

Petition for rehearing denied November 16, 1943

ON PETITION FOR REHEARING
(143 P. (2d) 243)

The respondents Anthony J. Connolly and Ann Connolly have filed a petition for rehearing, in which practically all the conclusions adverse to them announced in our former opinion are criticized.

The argument in support of the petition is in large part a repetition of contentions previously urged and to which we gave the most careful consideration before rendering our decision. What is now said by the petitioners does not convince us that the opinion should be changed in any substantial respect or that a rehearing should be granted, and we think that the court is not called upon to restate the reasons which impelled our conclusions.

▮ There are two matters, however, to which specific reference may be made. It will be recalled that Anthony J. Connolly satisfied his claim, in the amount of $37,127.68, against the estate of Thomas A. Connolly, deceased, as part of the consideration for the transfer and conveyance to Anthony J. Connolly and Ann Connolly by Kathleen Connolly of her interest, as the heir of her deceased husband, in the assets of the estate. It is urged that the amount of this claim, as well as the costs of administration which were advanced by Anthony J. Connolly, should be accorded priority as a lien against the real estate so conveyed, superior to the lien granted the plaintiff for the satisfaction of its claim against

the estate of Thomas A. Connolly, deceased. In determining that the plaintiff was entitled to such lien, we held that, in view of the fact that Anthony J. Connolly was administrator of the estate of Thomas A. Connolly, deceased, when he and his wife made the purchase in question from the heir, and the estate was still in course of administration, he could not be regarded as a *bona fide* purchaser in respect of the plaintiff's claim, but that he acquired the interest of the heir "burdened with all the indebtedness of Thomas A. Connolly, whenever or however it might be established." From this holding, to which we adhere, it follows that there is no question of subrogation or marshaling of assets, and no basis for allowing a lien in favor of Anthony J. Connolly in preference to that of the plaintiff.

The other matter relates to an alleged error, or at least obscurity, in the opinion in designating the real property, or the interest therein, made subject to the lien of the plaintiff's claim. To remove any possibility of misunderstanding, we supplement our opinion with the statement that the one-half interest in such real property acquired by Anthony J. Connolly and Ann Connolly from Patrick H. Connolly is not subject to such lien.

The petition for rehearing is denied.